UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

| | | |
|---|---|---|
| JAMES BERTONIS, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. |
| | : | |
| Plaintiff, | : | **CLASS ACTION COMPLAINT** |
| | : | |
| vs. | : | **JURY TRIAL DEMANDED** |
| | : | |
| MORGAN STANLEY, MORGAN STANLEY SMITH BARNEY LLC, E*TRADE SECURITIES LLC, BANK OF AMERICA CORPORATION, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, THE CHARLES SCHWAB CORPORATION, and CHARLES SCHWAB & CO., INC., | : | |
| | : | |
| Defendants. | : | |

——————————————————— x

By and through his undersigned counsel, James Bertonis ("Plaintiff") brings this class action against defendants Morgan Stanley, Morgan Stanley Smith Barney LLC ("MSSB"), and E*TRADE Securities LLC ("E*TRADE") (collectively, "Morgan Stanley Defendants"); defendants Bank of America Corporation ("BofA") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") (collectively, "Merrill Lynch Defendants"); and defendants The Charles Schwab Corporation ("Charles Schwab") and Charles Schwab & Co., Inc. ("CS&Co.") (collectively, "Schwab Defendants," and, together with the Morgan Stanley Defendants and Merrill Lynch Defendants, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including, but not limited to, review and analysis of: (a) documents created and distributed by Defendants; (b) public filings made by Morgan Stanley, BofA, and Charles Schwab with the United States Securities and Exchange Commission ("SEC"); (c) press releases disseminated by Defendants; and (d) news articles, websites, and other publicly available information concerning Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      Plaintiff brings this class action to recover damages arising out of Defendants' unlawful conduct related to their cash sweep programs ("Sweep Programs").  Under the Sweep Programs, Defendants swept idle customer cash into interest-bearing accounts at banks selected by and affiliated with Defendants.

2.      The cash sweep accounts were highly lucrative for Defendants and their affiliate banks but paid unreasonably low, below-market interest rates to customers.  As such, Defendants used the Sweep Programs to generate massive revenue for themselves at the expense of their customers.

3.    Defendants' use of the Sweep Programs to enrich themselves by paying unreasonably low interest rates to customers breached their fiduciary duties and contractual obligations and violated several state and federal laws including the Racketeer Influenced and Corrupt Organizations Act ("RICO Statute") and the Investment Advisers Act of 1940 ("Advisers Act").

4.    Accordingly, Defendants' Sweep Programs have begun to attract scrutiny from federal regulators.  In August 2024, Morgan Stanley announced that it was under investigation by the SEC for potential violations of the federal statue governing the conduct of investment advisors concerning the Sweep Programs.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.  This Court also has subject matter jurisdiction under 18 U.S.C. §1964(c), 28 U.S.C. §1331, and 50 U.S.C. §80b-14 because Plaintiff brings claims arising under the RICO Statute, 18 U.S.C. §1962, and the Advisers Act, 50 U.S.C. §§80b-1-21.

6.    This Court has personal jurisdiction over Defendants because, during the relevant time period, Defendants had offices in, did sufficient business in, had sufficient contacts with, and intentionally availed themselves of the laws and markets of New York through the promotion, sale, marketing, distribution, and operation of their products and services.

7.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because, during the relevant time period, Defendants transacted business and had offices in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

8.      In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails and interstate telephone communications.

## PARTIES

**Plaintiff**

9.      Plaintiff James Bertonis is a citizen of California, and during the relevant time period, Plaintiff held individual brokerage accounts and Roth IRA accounts with the Morgan Stanley Defendants, the Merrill Lynch Defendants, and the Schwab Defendants.  Uninvested cash Plaintiff held in these accounts was swept into the banks that Defendants selected in their discretion at the unreasonably low interest rates alleged herein.

**Defendants**

10.      Defendant Morgan Stanley is a Delaware corporation headquartered at 1585 Broadway, New York, New York 10036.  Morgan Stanley is a financial services company that conducts business throughout the United States, with assets totaling $1.2 trillion, loans totaling approximately $147.4 billion, and approximately 80,000 employees.  Morgan Stanley is the parent company and control persons of Defendants E*TRADE and MSSB.

11.      Defendant Morgan Stanley Smith Barney LLC is a Delaware limited liability company headquartered at 1585 Broadway, New York, New York 10036.  MSSB is a broker-dealer and a Registered Investment Advisor that offers brokerage and investment advisory services to its nationwide client base.  During the relevant time period, MSSB acted as agent for the establishment, maintenance, and operation of one of the Morgan Stanley Defendants' cash sweep programs, called the "Bank Deposit Program."  MSSB is a wholly owned subsidiary of, and controlled by, Defendant Morgan Stanley.

12.     Defendant E*TRADE Securities LLC is a Delaware limited liability company headquartered at 71 North Glebe Road, Arlington, Virginia 22203.  During the relevant time period, E*TRADE was an online brokerage platform that provided direct trading and investing services to customers.  Morgan Stanley acquired E*TRADE on October 2, 2020 ("E*TRADE Acquisition").  E*TRADE was a broker-dealer and a Registered Investment Advisor that offered brokerage and investment advisory services to its nationwide client base and acted as its customers' agent for the establishment, maintenance, and operation of two of the Morgan Stanley Defendants' cash sweep programs, called the Extended Sweep Deposit Account Program ("ESDA Program") and the Retirement Sweep Deposit Account Program ("RSDA Program" and, together with the Bank Deposit Program and ESDA Program, "Morgan Stanley Sweep Programs"). E*TRADE is an indirect, wholly owned subsidiary of, and controlled by, Defendant Morgan Stanley.

13.     Defendant Bank of America Corporation is a Delaware corporation headquartered at Bank of America Corporate Center, 100 North Tryon Street, Charlotte, North Carolina 28255. BofA is a financial services company that conducts business throughout the United States, with assets totaling $3.3 trillion, loans and leases totaling $1 trillion, and approximately 212,000 employees.  BofA is the parent company and control person of Defendant Merrill Lynch.

14.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a Delaware corporation headquartered at One Bryant Park, New York, New York 10036.  Merrill Lynch is a broker-dealer and a Registered Investment Advisor that offers brokerage and investment advisory services to its nationwide client base. Merrill Lynch acts as its customers' agent for the establishment, maintenance, and operation of the Merrill Lynch Defendants' cash sweep program

("Merrill Lynch Sweep Program"). Merrill Lynch is a wholly owned subsidiary of, and controlled by, Defendant BofA.

15.    Defendant The Charles Schwab Corporation is a Delaware corporation headquartered in Westlake, Texas. Charles Schwab is a provider of brokerage, banking, and financial advisory services. Charles Schwab is the parent company and control person of Defendant CS&Co.

16.    Defendant Charles Schwab & Co., Inc. is a California corporation headquartered in Westlake, Texas. CS&Co. is a broker-dealer and investment advisor that acts as its customers' agent for the establishment, maintenance, and operation of the Schwab Defendants' cash sweep programs, called the "Bank Sweep Program" and, for retirement accounts, the "Bank Sweep for Benefit Plans Program" (collectively, "Schwab Sweep Programs"). CS&Co. is a wholly owned broker dealer subsidiary of Defendant Charles Schwab.

## SUBSTANTIVE ALLEGATIONS

## THE MORGAN STANLEY SWEEP PROGRAMS

**Background on the Morgan Stanley Sweep Programs**

17.    Morgan Stanley is one of the largest financial services firms in the country. During the relevant time period, Morgan Stanley's wholly owned subsidiaries, MSSB and E*TRADE, offered brokerage and investment advisory services to customers nationwide. The Morgan Stanley Defendants offered their Sweep Programs through both MSSB and E*TRADE, including the Bank Deposit Program through MSSB and the ESDA Program and RSDA Program through E*TRADE.

18.    The terms and conditions of the Bank Deposit Program were set forth in the E*TRADE from Morgan Stanley Client Agreement for Self-Directed Accounts[1] ("Bank Deposit Program Agreement") and the Bank Deposit Program Disclosure Statement[2] (collectively, "Bank Deposit Program Documents"), which were posted on the public websites of E*TRADE and Morgan Stanley.  The Bank Deposit Program Agreement was governed by the laws of the State of New York and incorporated the terms of the Bank Deposit Program Disclosure Statement.

19.    Under the Bank Deposit Program, MSSB automatically swept eligible clients' uninvested cash balances into interest-bearing deposit accounts ("Bank Deposit Program Accounts") with a network of bank partners selected by the Morgan Stanley Defendants ("Bank Deposit Program Sweep Banks"), including at least two banks affiliated with the Morgan Stanley Defendants, Morgan Stanley Bank, N.A. and Morgan Stanley Private Bank, National Association ("Morgan Stanley Sweep Banks").[3]  Funds in Bank Deposit Program Accounts were insured by the Federal Deposit Insurance Corporation ("FDIC").[4]

20.    The Bank Deposit Program Documents provided that MSSB would act as an agent for customers in the Bank Deposit Program, stating, "[MSSB] as your agent will generally deposit cash in your Deposit Accounts at a Sweep Bank on the first business day after the cash is received

---

[1]    E*TRADE from Morgan Stanley, *E*TRADE from Morgan Stanley Client Agreement for Self-Directed Accounts*, https://us.etrade.com/l/f/agreement-library/client-agreement (Dec. 2024).

[2]    Morgan Stanley, *Bank Deposit Program Disclosure Statement*, https://www.morganstanley.com/content/dam/msdotcom/en/wealth-disclosures/pdfs/BDP_disclosure.pdf (Nov. 2024).

[3]    *Id.* at 2.

[4]    *Id.*

in your Account" and "[MSSB] will remain the agent and custodian for all your deposits in the [Bank Deposit] Program."[5]

21.     The sweep interest rates paid to customers were set by MSSB and the Bank Deposit Program Sweep Banks and could be changed "in their sole discretion and without prior notice to [customers]."[6]

22.     The Morgan Stanley Defendants provided the ESDA Program and RSDA Program to E*TRADE account holders from the date of the E*TRADE Acquisition on October 2, 2020, until approximately October 2023.  By approximately October 2023, Morgan Stanley had ceased offering the ESDA Program and RSDA Program to customers and converted all ESDA Program and RSDA Program participants to the Bank Deposit Program operated by MSSB, as described above.

23.     The terms and conditions of the ESDA Program were set forth in the in the ESDA Program Customer Agreement[7] ("ESDA Program Agreement") and the E*TRADE Customer Agreement[8] (collectively, "ESDA Program Documents" and, together with the Bank Deposit Program Documents, the "Morgan Stanley Program Documents"), which were posted on the public website of E*TRADE.

---

[5]     *Id.*

[6]     *Id*.

[7]     E*TRADE,                    *ESDA         Program          Customer              Agreement*,
https://us.etrade.com/e/t/welcome/help?id=1209026000 (Dec. 2024).

[8]     E*TRADE     from     Morgan     Stanley,     *E*TRADE     Customer     Agreement*,
https://web.archive.org/web/20221203033803/https://us.etrade.com/l/f/customer-
agreement?vanity=custagree (Sept. 1, 2022).

24.     Similar to the Bank Deposit Program, under the ESDA Program, E*TRADE automatically swept eligible clients' uninvested cash balances into interest-bearing deposit accounts ("ESDA Program Accounts") with a network of bank partners selected by the Morgan Stanley Defendants ("ESDA Program Sweep Banks"), including the Morgan Stanley Sweep Banks.[9]  Funds in the ESDA Program Accounts were insured by the FDIC.[10]

25.     The ESDA Program Documents provided that E*TRADE would act as an agent for customers in the ESDA Program, stating that the "ESDA is being provided to [the customer] by [E*TRADE] as [the customer's] agent"; the customer "understand[s] that [E*TRADE] as [the customer's] agent may agree to the deposit terms and conditions at each [ESDA] Program Bank where [the customer's] ESDA Program deposits are held, and such additional terms and conditions will be binding on [the customer]"; the customer "understand[s] that [he or she] will be able to access ESDA Program funds only through [his or her] relationship with [E*TRADE]"; and "[t]ransfers of [the customer's] ESDA cash balances from the [ESDA] Program Banks back to [the customer's] [E*TRADE] brokerage account may be made only by [E*TRADE] as [the customer's] agent or its service provider as subagent."[11]

26.     The sweep interest on deposits in the ESDA Program was paid "at rates determined by [E*TRADE] pursuant to its agreements with the [ESDA] Program Banks" and "subject to change at any time."[12]

---

[9]     E*TRADE, *ESDA Program Agreement*, *supra* note 7.

[10]    *Id.*

[11]    *Id.*

[12]    *Id.*

27.     The terms and conditions of the RSDA Program were set forth in the E*TRADE Financial RSDA Program Customer Agreement[13] ("RSDA Program Agreement") and the E*TRADE Customer Agreement[14] (collectively, "RSDA Program Documents"), which were posted on the public website of E*TRADE.  Similar to the Bank Deposit Program and the ESDA Program, under the RSDA Program, E*TRADE automatically swept eligible clients' uninvested cash balances into interest-bearing deposit accounts ("RSDA Program Accounts") with a network of bank partners selected by the Morgan Stanley Defendants, including the Morgan Stanley Sweep Banks.  Funds in the RSDA Program Accounts were insured by the FDIC.

28.     The RSDA Program Documents provided that E*TRADE would act as an agent for customers in the RSDA Program, stating that the "RSDA is being provided to [the customer] by [E*TRADE] as [the customer's] agent"; the customer "understand[s] that [E*TRADE] as [the customer's] agent may agree to the deposit terms and conditions at each [RSDA] Program Bank where [the customer's] RSDA Program deposits are held, and such additional terms and conditions will be binding on [the customer]"; the customer "understand[s] that [he or she] will be able to access RSDA Program funds only through [his or her] relationship with [E*TRADE]"; and "[t]ransfers of [the customer's] RSDA cash balances from the [RSDA] Program Banks back to [the customer's] [E*TRADE] brokerage account may be made only by [E*TRADE] as [the customer's] agent or its service provider as subagent."[15]

---

[13]  E*TRADE, *E*TRADE Financial RSDA Program Customer Agreement*, https://web.archive.org/web/20210128183929/https://us.etrade.com/e/t/prospectestation/pricing?id=1209047000 (June 2, 2023).

[14]  E*TRADE, *E*TRADE Customer Agreement*, https://web.archive.org/web/20221203033803/https://us.etrade.com/l/f/customer-agreement?vanity=custagree (Sept. 1, 2022).

[15]  *Id.*

29.     The sweep interest on deposits in the RSDA Program was paid "at rates determined by [E*TRADE] pursuant to its agreements with the [RSDA] Program Banks" and "subject to change at any time."[16]

30.     Additionally, during the relevant time period, E*TRADE retirement accounts became subject to the Morgan Stanley Individual Retirement Plan[17] and, with respect to Roth IRAs, the Morgan Stanley Roth IRA document[18] (collectively, "Morgan Stanley Retirement Account Documents" and, together with the Bank Deposit Program Documents, the ESDA Program Documents, and the RSDA Program Documents, the "Morgan Stanley Program Documents").  The Morgan Stanley Retirement Account Documents were governed by the laws of the State of New York and incorporated the terms of the Bank Deposit Program Disclosure Statement.

**The Morgan Stanley Defendants Reaped Significant Benefits from Their Sweep Programs to the Detriment of Their Customers, Who Were Paid Unreasonably Low Interest Rates**

31.     The Morgan Stanley Sweep Programs provided highly lucrative financial benefits to the Morgan Stanley Defendants and their affiliated Morgan Stanley Sweep Banks.  Under the Bank Deposit Program, Morgan Stanley Sweep Banks used customer deposits in the Bank Deposit Program to fund current and new businesses, including lending activities and investments, and paid MSSB an annual account-based fee for use of the deposits.

---

[16]   *Id.*

[17]   E*TRADE from Morgan Stanley, *Morgan Stanley Individual Retirement Plan*, https://us.etrade.com/l/f/agreement-library/ira-plan-documents (Jan. 2025).

[18]   E*TRADE from Morgan Stanley, *Morgan Stanley Roth IRA*, https://us.etrade.com/l/f/agreement-library/roth-ira-plan-documents (Jan. 2025).

32.     MSSB admitted that its "ability to influence the interest rate on [customers'] Deposit Accounts presents a ***conflict of interest***" because "[t]he lower the amount of interest paid to customers, the greater is the 'spread' earned by the Morgan Stanley Sweep Banks on deposits through the [Bank Deposit] Program."[19] By increasing the spread through lower interest payments to customers, the Morgan Stanley Defendants and the Morgan Stanley Sweep Banks were able to increase their profits from the Bank Deposit Program.

33.     Similarly, the ESDA Program Documents stated that E*TRADE "earn[s] fees based on the amount of money in the ESDA Program" and "will earn a higher fee if [the customer] participate[s] in the ESDA Program than if [the customer] invest[s] in other cash sweep products."[20] In addition, "[ESDA] Program Banks affiliated with [E*TRADE]," including the Morgan Stanley Sweep Banks, "will earn a return based on the spread between the rates paid in the ESDA and the returns earned by lending or investing deposit funds gathered through the ESDA."[21]

34.     Under the ESDA Program, the Morgan Stanley Sweep Banks "may use the cash balances in its ESDA Program deposit account to fund certain lending and investment activity. As with other banks, the profitability of [the Morgan Stanley Sweep Banks] is determined in large part by the difference, or 'spread,' between (i) the interest paid and other fees and costs incurred by it on the ESDA Program deposit accounts and (ii) the interest or other income earned on its

---

[19]    Morgan Stanley, *Bank Deposit Program Disclosure Statement*, *supra* note 2. The SEC also recognized that "cash sweep programs" are a "common source[] of conflicts of interest." U.S. Securities and Exchange Commission, Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest (Sept. 9, 2024), https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

[20]    E*TRADE, *ESDA Program Agreement*, *supra* note 7 at 1.

[21]    *Id.*

loans, investments, and other assets."[22]  This provides "a stable source of investable and lendable funds for [the Morgan Stanley Sweep Banks], which may be available at a lower cost than other funding sources."[23]

35.   The RSDA Program Documents similarly stated that E*TRADE "earn[s] fees based on the amount of money in the RSDA Program" and "may earn a higher fee if [the customer] participate[s] in the RSDA Program than if [the customer] invest[s] in other cash sweep products."[24]

36.   In addition, under the RSDA Program, E*TRADE-affiliated "Program Banks" including E*TRADE Bank and E*TRADE Savings Bank "may use the cash balances in RSDA Program deposit accounts to fund certain lending and investment activity."[25]  "As with other banks, the profitability of the Program Banks is determined in large part by the difference, or 'spread,' between (1) the interest paid and other fees and costs incurred by it on the RSDA Program deposit accounts; and (2) the interest or other income earned on its loans, investments, and other assets."[26] As such, "RSDA Program deposit accounts at E*TRADE Bank and E*TRADE Savings Bank provide a stable source of investable and lendable funds for the Program Banks, which may be at a lower cost than other funding sources."[27]

---

[22]   *Id.* at 6.

[23]   *Id.*

[24]   E*TRADE, *RSDA Program Agreement*, *supra* note 13 at 1.

[25]   *Id.* at 5.

[26]   *Id.*

[27]   *Id.*

37.    Due to these adverse financial incentives, the Morgan Stanley Defendants fail to negotiate and secure reasonable sweep interest rates for customers in the Morgan Stanley Sweep Programs.  As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

38.    The U.S. Department of Labor defines a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[28]

39.    Similarly, the U.S. Internal Revenue Service ("IRS") defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[29]  Thus, an interest rate is reasonable if it is based on a fair market valuation.

40.    In contrast, the Morgan Stanley Sweep Programs paid below-market interest rates throughout the relevant time period, currently ranging from a miniscule 0.01% to 0.15% depending on the amount deposited by a customer.[30]  These miniscule rates are *significantly* below several objective benchmarks of reasonableness:

- **Competitors' Sweep Programs**.  The Morgan Stanley Defendants' sweep interest rates were far below fair market value, as demonstrated by the rates paid by their competitors, who offered FDIC-insured sweep accounts similar to those in the

---

[28]    Grant of Individual Exemptions, 68 Fed. Reg. 34646 (June 10, 2003).

[29]    26 CFR §1.482-2(a)(2).

[30]    E*TRADE from Morgan Stanley, *Rate Monitor*, https://us.etrade.com/l/options-uninvested-cash/sweep-rates (last visited Jan. 3, 2025).

Morgan Stanley Sweep Programs. For example, competitor Moomoo's rate currently is 4.1%,[31] Webull's rate is 3.75%,[32] Vanguard's rate is 3.90%,[33] Fidelity's rate is 2.21%,[34] and Robert W. Baird's rate is between 1.37% and 2.83%.[35]

- **The Morgan Stanley Defendants' Other Interest-Bearing Accounts**. Further, the sweep interest rates paid by the Morgan Stanley Sweep Programs were far lower than the interest rates paid by the Morgan Stanley Defendants' other products outside of the Morgan Stanley Sweep Programs. For example, E*TRADE's FDIC-insured premium savings account currently pays 4.00%, E*TRADE's FDIC-insured max rate checking account pays 3.0%, Morgan Stanley's money market portfolio (MGPXX) pays 4.06%, and Morgan Stanley's U.S. government money market trust (DWGXX) pays 4.19%.[36]

- **Federal Funds Rate**. The sweep interest rates in the Morgan Stanley Sweep Programs were also far below the U.S. Federal Reserve's benchmark federal funds rate, currently at 4.25% to 4.50%.[37]

- **Three-Month Treasury Bill Rate**. The sweep interest rates in the Morgan Stanley Sweep Programs were far below the three-month U.S. treasury bill rate, currently at 4.23%.[38]

- **Repurchase Rate**. The sweep interest rates in the Morgan Stanley Sweep Programs were well below the overnight interest rate at which the U.S. Federal

---

[31]  Moomoo, *Boost your uninvested cash with 4.1% APY*, https://www.moomoo.com/us/invest/cashsweep (last visited Jan. 3, 2025).

[32]  Webull, *Webull High-Yield Case Management*, https://www.webull.com/cash-management (last visited Jan 3, 2025).

[33]  Vanguard, *What's the Vanguard Cash Plus Account*, https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last visited Jan. 3, 2025).

[34]   Fidelity, *Fidelity Individual Retirement Accounts (IRA)*, https://digital.fidelity.com/prgw/digital/fdic-interest-rate/ira (last visited Jan. 3, 2025).

[35]  Baird, *Cash Sweep Program*, https://www.rwbaird.com/cashsweeps/ (last visited Jan. 3, 2025).

[36]  E*TRADE from Morgan Stanley, *Rate Monitor*, *supra* note 30; E*TRADE from Morgan Stanley, *Banking Rates and Fees*, https://us.etrade.com/bank/bank-rates#tab_5 (Jan. 3, 2025).

[37]  Federal Reserve, *Economy at a Glance – Policy Rate*, https://www.federalreserve.gov/economy-at-a-glance-policy-rate.htm (last visited Jan. 3, 2025).

[38]  Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis*, https://fred.stlouisfed.org/series/DTB3 (last visited Jan. 3, 2025).

Reserve repurchases securities from private banks (*i.e.*, the repo rate), which is currently 4.25%.[39]

41.     These benchmarks individually and collectively demonstrated that the sweep interest rates in the Morgan Stanley Sweep Programs were unreasonable.  As a result, Plaintiff and the E*TRADE Class (defined below) suffered damages by receiving far lower interest payments than they would have received if the sweep interest rates were reasonable.

**The Morgan Stanley Defendants Breached Their Contractual Obligations and Fiduciary Duties Related to Their Sweep Programs**

42.     Under the Morgan Stanley Program Documents, MSSB and E*TRADE agreed to act as their customers' agents, and, thus, were contractually obligated to act in their customers' best interests in seeking and negotiating reasonable sweep interest rates under the Morgan Stanley Sweep Programs.  In other words, reasonableness was implicit in the Morgan Stanley Program Documents and governed the sweep interest rates paid to customers in the Morgan Stanley Sweep Programs.

43.     Moreover, the Morgan Stanley Defendants violated contractual duties to provide reasonable rates of return on their customers' cash balances in the Morgan Stanley Sweep Programs pursuant to the Internal Revenue Code ("IRC") and Employee Retirement Income Security Act of 1974 ("ERISA").  The RSDA Program Agreement contained a statement that IRA account customers "authorize such RSDA Program deposits and understand that each Program Bank will pay a ***reasonable*** rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under [IRC] Section 4975(d)(4)."[40]

---

[39]    Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate: Treasury Securities Sold by the Federal Reserve in the Temporary Open Market Operations*, https://fred.stlouisfed.org/series/RRPONTSYAWARD (last visited Jan. 3, 2025).

[40]    E*TRADE, *RSDA Program Agreement*, *supra* note 13 at 7.

44.     The Morgan Stanley Individual Retirement Plan stated that "[t]he Participant authorizes the deposit or investment of cash balances in the [IRA] Account in . . . deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the Custodian that bear a **_reasonable_** rate of interest."[41]   The Morgan Stanley Individual Retirement Plan also stated that neither the IRA account participant or custodian (defined as MSSB or a Morgan Stanley affiliate) shall "engage in any prohibited transaction within the meaning of [IRC] Section 4975 with respect to any Participant's Account."[42]

45.     Similarly, the Morgan Stanley Roth IRA document stated that "[t]he Participant authorizes the deposit or investment of cash balances in the Roth IRA in . . . deposit accounts with Morgan Stanley Bank, N.A. and or any other banking affiliate of the Custodian that bear a **_reasonable_** rate of interest."[43]   The Morgan Stanley Roth IRA document also stated that neither the Roth IRA account participant or custodian (defined as MSSB or an affiliate of MSSB) shall "engage in any prohibited transaction within the meaning of [IRC] Section 4975 with respect to any Participant's Roth IRA."[44]

46.     The IRC rules incorporated by the Morgan Stanley Program Documents are summarized in IRS Publication 590.  IRS Publication 590 states that "disqualified persons include your fiduciary," such as anyone who "[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of

---

[41]   Morgan Stanley, *Morgan Stanley Individual Retirement Plan*, *supra* note 17 at 12.

[42]   *Id.* at 25.

[43]   Morgan Stanley, *Morgan Stanley Roth IRA*, *supra* note 18 at 10.

[44]   *Id.* at 21

its assets," and that "prohibited transactions" are "any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person."[45]

47.    IRC Section 4975 states that a "disqualified person" includes a "fiduciary" and "a person providing services to the [IRA] plan" and that "prohibited transaction[s]" include any direct or indirect "transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan"; "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account"; or "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan."[46]  The IRC provides limited "exemptions" for these prohibited transactions, including "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution."[47]

48.    Therefore, under the IRC, the Morgan Stanley Defendants were "disqualified person[s]" and cash sweeps from IRA accounts to their affiliates, the Morgan Stanley Sweep Banks, for the benefit of the Morgan Stanley Defendants and the Morgan Stanley Sweep Banks, were "prohibited transactions."  The cash sweeps were not exempt because the Morgan Stanley Sweep Banks did not pay reasonable sweep interest rates, as discussed above.

---

[45]    Department of the Treasury, Internal Revenue Service, *Distributions from Individual Retirement Arrangements (IRAs)*, Publication 590-B (Mar. 12, 2024), https://www.irs.gov/pub/irs-pdf/p590b.pdf.

[46]    26 U.S.C. §4975(c) (1) (D) -(F), (e)(2).

[47]    26 U.S.C. §4975(d)(4).  Department of the Treasury regulations confirm that, under the IRC, investing retirement plan assets in deposits in a disqualified bank is exempted only if the deposits "bear[] a reasonable rate of interest" and, "in the case of a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization must name the institution and "state that [it] . . . may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)."  26 C.F.R. §54.4975-6(b)(1), (3).

49.     Section 408 of ERISA similarly exempts interested party transactions involving the investment of IRA assets in bank deposits only if they "bear a reasonable interest rate."[48]  This exemption did not apply because the Morgan Stanley Sweep Banks did not pay reasonable sweep interest rates.

50.     Thus, the Morgan Stanley Defendants' cash sweeps violated the IRC, ERISA, and the contractual provisions of the Morgan Stanley Program Documents that incorporated the IRC and ERISA.

51.     Further, the Morgan Stanley Defendants' conduct violated their fiduciary duties. As investment advisors, MSSB and E*TRADE owed fiduciary duties to their clients under the Advisers Act.[49]  Consistent with these fiduciary duties, the Bank Deposit Program Documents stated that MSSB was obligated to "serve the best interest of its client and not subordinate its client's interest to its own" and was not permitted to "place its own interests ahead of the interests of its client."[50]

52.     MSSB and E*TRADE owed similar duties of care under Regulation Best Interest, which required them to act in their retail customers' best interests and prohibited MSSB and E*TRADE from placing their own interests ahead of their retail customers' interests.[51]

53.     However, as discussed above, MSSB and E*TRADE violated these contractual and fiduciary duties by failing to act in their customers' best interests when they provided them with

---

[48]   29 U.S.C. §1108(b)(4).

[49]   *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR §276 (July 12, 2019) (interpreting Section 206 of the Advisers Act, 15 U.S.C. §80b-6).

[50]   *Id.*

[51]   *See* Securities and Exchange Commission, Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

unreasonably low sweep interest rates in comparison to several objective benchmarks discussed above, including the sweep interest rates paid by competitors and the federal funds rates.

54.     These allegations are strongly supported by the fact that the Morgan Stanley Sweep Programs are under scrutiny from the SEC.   In August 2024, Morgan Stanley disclosed that, "[s]ince April 2024, the firm has been engaged with and is responding to requests for information from the Enforcement Division of the SEC regarding advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940."[52]

**The Morgan Stanley Defendants Made Material Misrepresentations and Omissions Regarding Their Sweep Programs**

55.     In the Morgan Stanley Program Documents, the Morgan Stanley Defendants made material omissions by failing to disclose that, as discussed above, the Morgan Stanley Defendants established and used the Morgan Stanley Sweep Programs to enrich themselves by paying unreasonably low interest rates to customers in order to increase their financial benefits.

56.     The Bank Deposit Program Documents also misleadingly stated, "The interest rate is generally based on a variety of factors, including, but not limited to, current market conditions and competitive interest rates."[53]   This statement was misleading and omitted material facts because, in reality, the Bank Deposit Program always paid below-market and unreasonably low interest rates rather than "market" and "competitive" interest rates.

57.     In the Bank Deposit Program Documents, the Morgan Stanley Defendants made the additional misleading statements that "[t]he interest rates applicable to your Deposit Accounts at the Sweep Banks *may be higher or lower* than the interest rates available on other deposit

---

[52]   Morgan     Stanley,     Form     10-Q,     at     68     (Aug.     5,     2024), https://www.sec.gov/Archives/edgar/data/895421/000089542124000403/ms-20240630.htm.

[53]   Morgan Stanley, *Bank Deposit Program Disclosure Statement*, *supra* note 2.

accounts offered by a Sweep Bank or on deposit accounts offered by other depository institutions" and "[t]he Morgan Stanley Sweep Banks and the Program Banks *can and sometimes do* pay higher interest rates on some deposits they receive directly than they pay on deposits received through the [Bank Deposit] Program."[54]  These statements were misleading and omitted material facts because, in reality, the Bank Deposit Program interest rates were *always* significantly below market alternatives.

58.    The Morgan Stanley Defendants made similar misstatements and omissions in the ESDA Program Documents: "The interest rate I earn on my ESDA Program deposits *may be higher or lower* than the rates available to depositors making non-ESDA Program deposits with Program Banks directly, through other types of accounts at [E*TRADE], with other depository institutions in comparable accounts, or with alternative short-term investment options."[55]  These statements were misleading and omitted material facts because, in reality, the ESDA Program interest rates were *always* significantly below market alternatives.

59.    With respect to IRA accounts, the RSDA Program Agreement misleadingly stated that IRA account customers "authorize such RSDA Program deposits and understand that each Program Bank will pay a *reasonable* rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under [IRC] Section 4975(d)(4)."[56]

60.    The Morgan Stanley Individual Retirement Plan misleadingly stated that "[t]he Participant authorizes the deposit or investment of cash balances in the [IRA] Account in . . . deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the

---

[54]    *Id.*

[55]    E*TRADE, *ESDA Program Agreement*, *supra* note 7 at 6.

[56]    E*TRADE, *RSDA Program Agreement*, *supra* note at 7.

Custodian that bear a **reasonable** rate of interest."[57]   Further, the Morgan Stanley Individual Retirement Plan misleadingly stated that neither the IRA account participant or custodian (defined as MSSB or a Morgan Stanley affiliate) shall "engage in any prohibited transaction within the meaning of [IRC] Section 4975 with respect to any Participant's Account."[58]

61.     Similarly, the Morgan Stanley Roth IRA document misleadingly stated that "[t]he Participant authorizes the deposit or investment of cash balances in the Roth IRA in . . . deposit accounts with Morgan Stanley Bank, N.A. and/or any other banking affiliate of the Custodian that bear a **reasonable** rate of interest."[59]   The Morgan Stanley Roth IRA document also misleadingly stated that neither the Roth IRA account participant or custodian (defined as MSSB or an affiliate of MSSB) shall "engage in any prohibited transaction within the meaning of [IRC] Section 4975 with respect to any Participant's Roth IRA."[60]

62.     The above statements were misleading and omitted material facts because, as discussed above: (a) the Morgan Stanley Defendants paid unreasonably low interest rates on cash that MSSB and E*TRADE swept from IRA accounts into the bank accounts of affiliates including the Morgan Stanley Banks; and (b) such deposits were not in compliance with Section 4975 of the IRC or Section 408 of ERISA.

63.     Moreover, the Morgan Stanley Defendants' statements about potentially **lower** interest rates do not excuse their contractual and fiduciary obligations to pay **reasonable** interest

---

[57]   Morgan Stanley, *Morgan Stanley Individual Retirement Plan*, *supra* note 17 at 12.

[58]   *Id.* at 25.

[59]   *Morgan Stanley Roth IRA*, *supra* note 18 at 10.

[60]   *Id.* at 21.

rates, as described above. These statements must be construed harmoniously with the Morgan Stanley Defendants' contractual and fiduciary obligations.

**The Morgan Stanley Defendants Violated the RICO Statute**

64. The Morgan Stanley Defendants violated the RICO Statute through their implementation of the Morgan Stanley Sweep Programs.

65. MSSB and E*TRADE were "enterprises" within the meaning of the RICO Statute. Through MSSB and E*TRADE, the Morgan Stanley Defendants knowingly and intentionally devised and operated the Morgan Stanley Sweep Programs as a scheme to defraud customers, including Plaintiff and the E*TRADE Class (defined below). The Morgan Stanley Defendants used the Morgan Stanley Sweep Programs to benefit and enrich themselves through, among other things, the payment of unreasonably low interest rates to customers on money deposited into the Morgan Stanley Sweep Programs.

66. The Morgan Stanley Sweep Programs involved commercial activities across state lines, including the Morgan Stanley Defendants' distribution of the Morgan Stanley Program Documents to customers, and the Morgan Stanley Defendants' receipt and transfer of money deposited by customers.

67. Through the Morgan Stanley Sweep Programs, the Morgan Stanley Defendants conducted and participated in a pattern of racketeering activity within the meaning of the RICO Statute ("Racketeering Acts"). The Morgan Stanley Defendants' Racketeering Acts included indictable, predicate offenses under 18 U.S.C. §§1341 and 1343 based on the Morgan Stanley Defendants' fraudulent use of interstate mail and wire communications, including posting the materially false and misleading Morgan Stanley Program Documents on the public websites of E*TRADE and Morgan Stanley and distributing them to customers throughout the country.

68.     The Racketeering Acts were related in that they were taken in furtherance of the Morgan Stanley Defendants' Sweep Program scheme.  The Racketeering Acts occurred, and continue to occur, regularly and continuously over a multi-year period during the operation of the Morgan Stanley Sweep Programs.

69.     The Morgan Stanley Defendants' conduct and the Racketeering Acts were part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  The Morgan Stanley Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Program scheme, including posting the materially false and misleading Morgan Stanley Program Documents on the public websites of E*TRADE and Morgan Stanley and distributing them to customers throughout the country.

70.     As Morgan Stanley Sweep Program customers, Plaintiff and the E*TRADE Class (defined below) were damaged by the Morgan Stanley Defendants' Racketeering Acts due to the Morgan Stanley Defendants' payment of unreasonably low interest rates on the money customers deposited into the Morgan Stanley Sweep Programs.

### CLASS ACTION ALLEGATIONS AGAINST THE MORGAN STANLEY DEFENDANTS

71.     Plaintiff brings this action against the Morgan Stanley Defendants as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all E*TRADE customers who had cash deposits or balances in the Morgan Stanley Sweep Programs from the time of the E*TRADE Acquisition (October 2, 2020) through present ("E*TRADE Class").  Excluded from the E*TRADE Class are the Morgan Stanley Defendants, officers, and directors of the Morgan Stanley Defendants at all relevant times, members of their immediate

families and their legal representatives, heirs, successors, or assigns, and any entity in which the Morgan Stanley Defendants have or had a controlling interest.

72.    The E*TRADE Class members are so numerous that their individual joinder is impracticable.  While the exact number of E*TRADE Class members can only be determined by appropriate discovery, Plaintiff believes that E*TRADE Class members number in the thousands, and are geographically dispersed, because Morgan Stanley oversees approximately $7 trillion in client assets worldwide.

73.    Plaintiff's claims are typical of E*TRADE Class members' claims because Plaintiff's cash deposits were subject to the Morgan Stanley Sweep Programs, and, therefore, Plaintiff's claims, and those of all other E*TRADE Class members, arose from the same wrongful conduct by the Morgan Stanley Defendants alleged herein.

74.    Plaintiff will fairly and adequately protect the interests of the E*TRADE Class members and has retained counsel experienced and competent in complex class action litigation. Plaintiff has no interests that are contrary to, or in conflict with, the members of the E*TRADE Class that Plaintiff seeks to represent.

75.    The prosecution of separate actions by individual E*TRADE Class members would create a risk of inconsistent or varying adjudications with respect to individual E*TRADE Class members that would establish incompatible standards of conduct for the party opposing the E*TRADE Class or a risk of adjudications that, as a practical matter, would be dispositive of the interests of other E*TRADE Class members who were not parties to the adjudications or would substantially impair or impede the ability of such E*TRADE Class members to protect their interests.

76.    Because the Morgan Stanley Defendants act or refuse to act on grounds that apply generally to the E*TRADE Class, final injunctive relief or corresponding declaratory relief is appropriate with respect to the E*TRADE Class as a whole.

77.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the E*TRADE Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the E*TRADE Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

78.    Questions of law and fact common to the members of the E*TRADE Class predominate over any questions that may affect only individual members in that the Morgan Stanley Defendants act on grounds generally applicable to the entire E*TRADE Class.  Among the questions of law and fact common to the E*TRADE Class are:

(a)    whether the Morgan Stanley Defendants violated the laws as alleged herein;

(b)    whether MSSB and E*TRADE owed fiduciary duties to Plaintiff and members of the E*TRADE Class in connection with the Morgan Stanley Sweep Programs;

(c)    whether MSSB and E*TRADE breached their fiduciary duties to Plaintiff and members of the E*TRADE Class in connection with the Morgan Stanley Sweep Programs;

(d)    whether MSSB and E*TRADE breached their contractual obligations to Plaintiff and members of the E*TRADE Class in connection with the Morgan Stanley Sweep Programs;

(e)    whether the Morgan Stanley Defendants violated the Advisers Act;

(f)    whether the Morgan Stanley Defendants violated the RICO Statute;

(g)    whether the Morgan Stanley Defendants made material misrepresentations and/or omissions in connection with the Morgan Stanley Sweep Programs;

(h)    whether the Morgan Stanley Defendants were unjustly enriched by their wrongful conduct;

(i)    whether the members of the E*TRADE Class sustained damages as a result of the alleged wrongful conduct by the Morgan Stanley Defendants, and, if so, the appropriate measure of damages; and

(j)    whether the members of the E*TRADE Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

## COUNT I

### BREACH OF FIDUCIARY DUTY AGAINST ALL MORGAN STANLEY DEFENDANTS

79.    Plaintiff incorporates paragraphs 17-78 above as though fully set forth herein.

80.    During the relevant time period, MSSB and E*TRADE were the agents of, and investment advisors to, customers enrolled in the Morgan Stanley Sweep Programs, including Plaintiff and the E*TRADE Class.  Morgan Stanley owned and controlled MSSB and E*TRADE.

81.    MSSB and E*TRADE owed fiduciary duties to Plaintiff and the E*TRADE Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the E*TRADE Class.

82.    MSSB and E*TRADE violated their duties to act in the best interests of Plaintiff and the E*TRADE Class by using the Morgan Stanley Sweep Programs to enrich themselves, Morgan Stanley, and the Morgan Stanley Sweep Banks at the expense of customers who were paid unreasonably low interest rates, as described above.

83.     MSSB and E*TRADE also violated their duties to deal fairly and honestly with Plaintiff and the E*TRADE Class by making material misrepresentations and omissions in the Morgan Stanley Program Documents, as described above.

84.     Further, MSSB and E*TRADE violated their duties to act with reasonable care to verify the truthfulness of the information set forth in the Morgan Stanley Sweep Programs, which were materially misleading and omit material facts for the reasons described above.

85.     As a direct and proximate result of MSSB's and E*TRADE's breaches of fiduciary duties, Plaintiff and the E*TRADE Class suffered damages and are entitled to recover such damages from the Morgan Stanley Defendants.

## COUNT II

### VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940
### AGAINST ALL MORGAN STANLEY DEFENDANTS

86.     Plaintiff incorporates paragraphs 17-78 above as though fully set forth herein.

87.     During the relevant time period, MSSB and E*TRADE were registered as investment advisers under the Advisers Act.  Morgan Stanley owned and controlled MSSB and E*TRADE.

88.     MSSB and E*TRADE violated Section 206 of the Advisers Act by failing to serve the best interests of their clients, Plaintiff and the E*TRADE Class, and by placing their own interests ahead of Plaintiff's and the E*TRADE Class's interests in connection with the Morgan Stanley Sweep Programs, as further alleged herein.  *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019).

89.     The Morgan Stanley Program Documents should be deemed void pursuant to Section 215 of the Advisers Act, which provides that every:

(b) . . . contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

90.    Accordingly, Plaintiff seeks rescission of the Morgan Stanley Program Documents and restitution of the consideration given pursuant to their purported terms.

## COUNT III

## BREACH OF CONTRACT AGAINST ALL MORGAN STANLEY DEFENDANTS

91.    Plaintiff incorporates paragraphs 17-78 above as though fully set forth herein.

92.    Plaintiff and E*TRADE Class members were parties to the Morgan Stanley Program Documents with MSSB and/or E*TRADE. The Morgan Stanley Program Documents set forth the contractual terms and conditions of the Morgan Stanley Sweep Programs. Morgan Stanley owned and controlled MSSB and E*TRADE.

93.    Pursuant to the Morgan Stanley Program Documents, MSSB and E*TRADE were contractually obligated to act as agents on behalf of Plaintiff and the E*TRADE Class, and, thus, were contractually obligated to act in Plaintiff's and the E*TRADE Class's best interests in seeking and negotiating reasonable sweep interest rates under the Morgan Stanley Sweep Programs.

94.    MSSB and E*TRADE breached their contractual obligations by failing to provide Plaintiff and the E*TRADE Class with reasonable interest rates on their deposits in the Morgan Stanley Sweep Programs. Rather, the sweep interest rates provided by MSSB and E*TRADE were below market and unreasonably low. As such, MSSB and E*TRADE denied Plaintiff and

the E*TRADE Class the full benefit of their bargain under the Morgan Stanley Program Documents.

95.    As a direct and proximate result of MSSB's and E*TRADE's breaches of contract, Plaintiff and the E*TRADE Class sustained damages.

## COUNT IV

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALL MORGAN STANLEY DEFENDANTS

96.    Plaintiff incorporates paragraphs 17-78 above as though fully set forth herein.

97.    Plaintiff and E*TRADE Class members were parties to the Morgan Stanley Program Documents with MSSB and/or E*TRADE.  The Morgan Stanley Program Documents set forth the contractual terms and conditions of the Morgan Stanley Sweep Programs.  Morgan Stanley owned and controlled MSSB and E*TRADE.

98.    Implicit in the Morgan Stanley Program Documents were duties of good faith and fair dealing.

99.    MSSB and E*TRADE breached their duties of good faith and fair dealing by failing to provide Plaintiff and the E*TRADE Class with fair and reasonable sweep interest rates on their cash sweep balances in the Morgan Stanley Sweep Programs.  Rather, the interest rates provided by MSSB and E*TRADE were below market and unreasonably low.  As such, MSSB and E*TRADE denied Plaintiff and the E*TRADE Class the full benefit of their bargain under the Morgan Stanley Program Documents.

100.    As a direct and proximate result of MSSB's and E*TRADE's breaches of the implied covenants of good faith and fair dealing, Plaintiff and the E*TRADE Class sustained damages.

## COUNT V

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962(c)-(d), AGAINST ALL MORGAN STANLEY DEFENDANTS

101.    Plaintiff incorporates paragraphs 17-78 above as though fully set forth herein.

102.    This claim arises under 18 U.S.C. §1962(c)-(d) of the RICO Statute, which provide in relevant part:

> (c)     It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

> (d)     It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

103.    At all relevant times, the Morgan Stanley Defendants were "person[s]" because they are capable of holding a legal or beneficial interest in property.

104.    During the relevant time period, MSSB and E*TRADE were enterprises engaged in interstate commerce.   Through MSSB and E*TRADE, the Morgan Stanley Defendants knowingly and intentionally devised and operated the Morgan Stanley Sweep Programs as schemes to defraud investors.  The Morgan Stanley Defendants used the Morgan Stanley Sweep Programs to enrich themselves and the Morgan Stanley Sweep Banks by paying unreasonably low interest rates to Sweep Program customers.

105.    The Morgan Stanley Defendants conducted and participated in multiple, related Racketeering Acts for the purpose of implementing the Morgan Stanley Sweep Programs.  The Racketeering Acts, which occurred, and continue to occur, regularly and continuously during the operation of the Morgan Stanley Sweep Programs over a multi-year period, constituted a "pattern of racketeering activity."  The Racketeering Acts were made possible by the regular, repeated, and continuous use of the employees, facilities, and services of MSSB and E*TRADE.

106.    The Morgan Stanley Defendants' Racketeering Acts included the following indictable, predicate offenses:

(a)    **Mail Fraud**: The Morgan Stanley Defendants violated 18 U.S.C. §1341 by sending and receiving materials via United States mail and commercial interstate carriers for the purpose of conducting the fraudulent Sweep Program scheme, including the Morgan Stanley Program Documents.  As described above, the Morgan Stanley Program Documents contained material misrepresentations and omissions knowingly and intentionally made by the Morgan Stanley Defendants for the purpose of defrauding customers.

(b)    **Wire Fraud**: The Morgan Stanley Defendants violated 18 U.S.C. §1343 by transmitting and receiving writings and sounds by means of interstate wire communication for the purpose of conducting the fraudulent Sweep Program scheme.  The writings included the Morgan Stanley Program Documents, which were posted on E*TRADE's and Morgan Stanley's public websites.  As described above, the Morgan Stanley Program Documents contained material misrepresentations and omissions knowingly and intentionally made by the Morgan Stanley Defendants for the purpose of defrauding customers.

107.    The Morgan Stanley Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  The Morgan Stanley Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Program scheme, including mailing and transmitting the Morgan Stanley Program Documents to customers.

108.    Plaintiff and the E*TRADE Class suffered damages by reason of the Morgan Stanley Defendants' payment of unreasonably low interest rates on their Sweep Program deposits, in violation of 18 U.S.C. §1962(c)-(d).

109.    Plaintiff's and the E*TRADE Class's injuries were directly and proximately caused by the Morgan Stanley Defendants' racketeering activity.

**COUNT VI**

**NEGLIGENCE AGAINST ALL MORGAN STANLEY DEFENDANTS**

110.    Plaintiff incorporates paragraphs 17-78 above as though fully set forth herein.

111.    During the relevant time period, MSSB and E*TRADE were the agents of, and investment advisors to, customers enrolled in the Morgan Stanley Sweep Programs, including Plaintiff and the E*TRADE Class.  E*TRADE also facilitated the Morgan Stanley Sweep Programs by accepting payments from customers through its online investment platform, which are swept into the Morgan Stanley Sweep Programs.  Morgan Stanley owned and controlled MSSB and E*TRADE.

112.    The Morgan Stanley Defendants owed Plaintiff and the E*TRADE Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Morgan Stanley Sweep Programs.

113.    The Morgan Stanley Defendants' conduct with respect to the Morgan Stanley Sweep Programs, as described above, was negligent.  By failing to provide Plaintiff and the E*TRADE Class with fair and reasonable sweep interest rates on their cash sweep balances in the Morgan Stanley Sweep Programs, the Morgan Stanley Defendants breached their duty to act with reasonable care.

114.    The Morgan Stanley Defendants' negligence directly and proximately caused harm to Plaintiff and the E*TRADE Class.

## COUNT VII

### NEGLIGENT MISREPRESENTATIONS AND OMISSIONS
### AGAINST ALL MORGAN STANLEY DEFENDANTS

115.    Plaintiff incorporates paragraphs 17-78 above as though fully set forth herein.

116.    During the relevant time period, MSSB and E*TRADE were the agents of, and investment advisors to, customers enrolled in the Morgan Stanley Sweep Programs, including Plaintiff and the E*TRADE Class.    E*TRADE also facilitated the Morgan Stanley Sweep Programs by accepting payments from customers through its online investment platform, which are swept into the Morgan Stanley Sweep Programs.    Morgan Stanley owned and controlled MSSB and E*TRADE.

117.    The Morgan Stanley Defendants owed Plaintiff and the E*TRADE Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Morgan Stanley Sweep Programs.

118.    The Morgan Stanley Defendants negligently made material misrepresentations and omissions in the Morgan Stanley Program Documents, as described above, which were posted on E*TRADE's and Morgan Stanley's public websites.

119.    Plaintiff and the proposed E*TRADE Class justifiably relied on the Morgan Stanley Defendants' Program Documents and accordingly deposited and maintained cash balances in the Morgan Stanley Sweep Programs to their detriment.

120.    The Morgan Stanley Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the proposed E*TRADE Class.

## COUNT VIII

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW §349
### AGAINST ALL MORGAN STANLEY DEFENDANTS

121.    Plaintiff incorporates paragraphs 17-78 above as though fully set forth herein.

122.    The Morgan Stanley Defendants' acts and practices with respect to the Morgan Stanley Sweep Programs, as described above, constituted unlawful, unfair, misleading, and deceptive business acts and practices in violation of Section 349 of New York's General Business Law ("GBL").

123.    The Morgan Stanley Defendants' misleading and deceptive business acts and practices with respect to the Morgan Stanley Sweep Programs adversely impacted Plaintiff and the E*TRADE Class, and, therefore, constituted consumer-oriented conduct under GBL §349, which resulted in direct harm to Plaintiff and the E*TRADE Class.

124.    Accordingly, Plaintiff and the E*TRADE Class seek appropriate relief under GBL §349, including injunctive relief and damages.

## COUNT IX

### UNJUST ENRICHMENT AGAINST ALL MORGAN STANLEY DEFENDANTS

125.    Plaintiff incorporates paragraphs 17-78 above as though fully set forth herein.

126.    The Morgan Stanley Defendants financially benefitted from the unlawful acts alleged herein by paying Plaintiff and the E*TRADE Class unreasonably low and below market interest payments on their Sweep Program balances.  These unlawful acts caused Plaintiff and the E*TRADE Class to suffer injury and monetary loss.

127.    As a result of the unlawful acts alleged herein, the Morgan Stanley Defendants were unjustly enriched at the expense of Plaintiff and the E*TRADE Class.

128.    The Morgan Stanley Defendants have received, and are holding, funds belonging to Plaintiff and the E*TRADE Class, which in equity the Morgan Stanley Defendants should not be permitted to keep but should be required to refund to Plaintiff and the E*TRADE Class.

## THE MERRILL LYNCH SWEEP PROGRAM

### Background on the Merrill Lynch Sweep Program

129.    During the relevant time period, BofA's wholly owned subsidiary, Merrill Lynch, operated as a wealth management division of BofA, offering brokerage and investment advisory services to customers nationwide.  The Merrill Lynch Defendants provided their Sweep Program to customers of Merrill Lynch.

130.    The terms and conditions of the Merrill Lynch Sweep Program were set forth in Merrill Lynch's Client Relationship Summary and Client Relationship Agreement[61] ("Merrill Account Agreement"), Best Interest Disclosure Statement[62] ("Merrill Disclosure Statement"), CMA Financial Service Cash Management Account Disclosures[63] ("Merrill CMA Disclosures"), and Sweep Program Guide for Merrill Clients[64] ("Sweep Program Guide"), which were posted on the public website of Merrill Lynch.  The Merrill Account Agreement was governed by the laws

---

[61]    Merrill    Lynch,    *Client    Relationship    Summary*, https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/ClientRelationshipAgreement.pdf  (Mar. 22, 2024).

[62]    Merrill    Lynch,    *Best    Interest    Disclosure    Statement*, https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/Regulation-Best-Interest-Disclosure-Statement_RBIDISC.pdf (Apr. 2024).

[63]    Merrill    Lynch,    *CMA    Financial    Service    Cash    Management    Account*, https://olui2.fs.ml.com/Publish/Content/application/pdf/GWMOL/CashManagementAccountCMADisclosuresandAccountAgreement.pdf (July 2024).

[64]    Merrill    Lynch,    *Sweep    Program    Guide*, https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/Sweep-Program.pdf (Aug. 2024).

of the State of New York and incorporated the terms of the Merrill Disclosure Statement and Merrill CMA Disclosures.

131.    Under the Merrill Lynch Sweep Program, Merrill automatically swept eligible clients' uninvested cash balances into interest-bearing deposit accounts ("Merrill Deposit Accounts") at one or more of the following banks affiliated with BofA and Merrill: Bank of America, N.A. ("BANA"), Bank of America California, N.A. ("BA-CA"), and Merrill Lynch Bank and Trust Company (Cayman) Limited (collectively, "Merrill Affiliated Banks"). Funds in Merrill Bank Deposit Accounts were insured by the FDIC.

132.    Merrill Lynch acted as agent for customers in the Merrill Lynch Sweep Program: "In the United States, Merrill Lynch acts as a broker (i.e., agent) for its private clients as well as its corporate and institutional clients. . . . .   Through BANA, and other bank Affiliates (Bank Affiliates), Merrill Lynch provides access to banking services, including lending and cash sweep services."[65]  Similarly, the Merrill CMA Disclosures stated that "Merrill Lynch is acting as agent and messenger for its customers for the deposits at BANA and/or BA-CA."[66]

133.    The Sweep Program Guide stated that Merrill Deposit Accounts "will bear a rate of interest that has been established for, and in light of the features of, the Sweep Program.  The rate of interest for such deposit accounts is periodically set and reset by the Merrill Affiliated Banks in their discretion."[67]

---

[65]    Merrill Lynch, *Client Relationship Summary*, *supra* note 61; Merrill Lynch, *Best Interest Disclosure Statement*, *supra* note 62.

[66]    Merrill Lynch, *CMA Financial Service Cash Management Account*, *supra* note 63.

[67]    Merrill Lynch, *Sweep Program Guide*, *supra* note 64.

134.    The Merrill Lynch Defendants also provided their Sweep Program to retirement account customers.  Documents governing the retirement accounts included Merrill Lynch's Traditional IRA Disclosure and Custodial Agreement[68] ("Merrill Traditional IRA Agreement"), Roth Individual Retirement Account (Roth IRA) Disclosure and Custodial Agreement[69] ("Merrill Roth IRA Agreement"), Merrill Edge Self-Directed BASIC Retirement Account Application Booklet and Agreements,[70] and Retirement Cash Management Account (RCMA) Financial Services Document[71] (collectively, "Merrill Retirement Account Documents" and, together with the Merrill Account Agreement, the Merrill Disclosure Statement, the Merrill CMA Disclosures, and the Sweep Program Guide, the "Merrill Lynch Sweep Program Documents").  The Merrill Retirement Account Documents were governed by New York law and posted on the public website of Merrill Lynch.

**The Merrill Lynch Defendants Reaped Significant Benefits From Their Sweep Program to the Detriment of Their Customers, Who Were Paid Unreasonably Low Interest Rates**

135.    The Merrill Lynch Sweep Program provided highly lucrative financial benefits to the Merrill Lynch Defendants and the Merrill Affiliated Banks.  First, as disclosed in the Merrill

---

[68]    Merrill Lynch, Disclosure and Custodial Agreement, *Traditional IRA Disclosure Statement*, https://olui2.fs.ml.com/publish/content/application/pdf/gwmol/traditionaliracustodialagreementdisclosure.pdf (last visited Jan. 3, 2025)*.*

[69]    Merrill Lynch, Disclosure and Custodial Agreement, *Roth Individual Retirement Account (Roth IRA) Disclosure Statement and Custodial Agreement*, https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/RothIRACustodialAgreementDisclosure.pdf (last visited Jan. 3, 2025).

[70]    Merrill Lynch, *Merrill Edge Self-Directed BASIC Retirement Account Application Booklet and Agreements*, https://olui2.fs.ml.com/Publish/Content/application/pdf/GWMOL/BASIC-account-application-agreement.pdf (last visited Jan. 3, 2025).

[71]    Merrill Lynch, *Retirement Cash Management Account (RCMA) Financial Service Documents*, https://olui2.fs.ml.com/publish/content/application/pdf/GWMOL/RCMA-account-agreement-program-description-MESD.pdf (last visited Jan. 3, 2025).

Disclosure Statement, "Merrill and [their] Bank Affiliates benefit financially when [customers] hold any cash balances in the bank deposit accounts affiliated with the Cash Sweep Program. Merrill Lynch receives payments from our Bank Affiliates on a per account basis for each account that sweeps to one of [its] Bank Affiliates relating to offering and supporting the Cash Sweep Program."[72]

136.    Second, "Merrill Advisors and [Merrill Financial Solutions Advisors] receive increased compensation based on achieving a number of strategic objectives, including, among other activities, the growth in their clients' participation in bank sweep deposits and sweep money market funds, checking and savings accounts, the Preferred deposit product, loans, mortgages and margin lending."[73]

137.    Third, through Merrill Lynch Sweep Program deposits, the Merrill Bank Affiliates "receive a stable, cost-effective source of funding. They use these bank deposits to fund current and new lending, investment and other business activities. The participation of the Bank Affiliates in the Cash Sweep Program increases their respective deposits and accordingly overall profits."[74]

138.    Moreover, the Merrill Lynch Defendants were able to maximize their financial gain from the Merrill Lynch Sweep Program by paying customers unreasonably low rates, creating an admitted "conflict of interest" with customers:

> Bank profitability is determined, in large part, by the "spread" they earn on the deposits – the difference between the interest paid on the bank deposits and other amounts paid to Merrill related to these deposits, on the one hand, and the interest or other income earned on loans, investments and other assets which may be funded in part by bank deposits, on the other hand. The greater the amount of cash balances maintained in your accounts (which could be as a result of a recommendation from

---

[72]    Merrill Lynch, *Best Interest Disclosure Statement*, *supra* note 62.

[73]    *Id.*

[74]    *Id.*

your financial advisor) that is swept into a bank deposit account affiliated with the Cash Sweep Program and ***the lower the interest rate paid on the related bank deposit, the more our Bank Affiliates benefit***.[75]

139.    Similarly, the Merrill Retirement Account Documents disclosed:

There are ***conflicts of interest*** relating to the Sweep Program . . . .  If you hold cash balances in your account, both Merrill Lynch and the Merrill Lynch Affiliated Banks benefit financially when your cash is "swept" to and held in deposit with them under the Sweep Program. Merrill Lynch receives compensation from the Merrill Lynch Affiliated Banks for its services relating to the Sweep Program.[76]

140.    Specifically, according to the Merrill Retirement Account Documents, Merrill Lynch directly received "[u]p to $100 per year from BANA and/or BA-CA for each account that sweeps to" the Merrill Lynch Sweep Program; Merrill Lynch "[f]inancial advisors are compensated based on their clients' total deposits held in Merrill Lynch Affiliated Banks" and "can receive a compensation award based on achieving a number of strategic objectives, including, among other activities, the growth in their clients' balances in bank sweep deposit accounts and sweep money market funds," creating "a conflict of interest"; and the Merrill Lynch Affiliated Banks "benefit financially from their use of the deposits," as follows:

Through the Sweep Program, they receive a stable, cost-effective source of funding. They use bank deposits to fund current and new lending, investment and other business activities. Their participation in the Sweep Program increases their respective deposits and overall profits. Bank profitability is determined in large part by the "spread" they earn on the deposits - the difference between the interest paid and other costs incurred by them on bank deposits (including payments to Merrill Lynch), on the one hand, and the interest or other income earned on their loans, investments and other assets, which may be funded in part by bank deposits, on the other hand. The greater the amount of cash balances maintained in deposit accounts with the Merrill Lynch Affiliated Banks (which could be as a result of a

---

[75]    *Id.*  The SEC also recognized that "cash sweep programs" are a "common source[] of conflicts of interest."  U.S. Securities and Exchange Commission, Staff Bulletin:  Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest (Sept. 9, 2024), https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

[76] Merrill Lynch, *Traditional IRA Disclosure Statement*, *supra* note 68 at 38-39; Merrill Lynch, *Roth Individual Retirement Account (Roth IRA)*, *supra* note 69 at 35-36.

recommendation from your financial advisor) and ***the lower the interest rate paid on the related bank deposit, the more the Merrill Lynch Affiliated Banks benefit***.[77]

141.    Due to these admittedly adverse financial incentives, the Merrill Lynch Defendants failed to negotiate and secure reasonable sweep interest rates for customers in the Merrill Lynch Sweep Program.    As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

142.    The U.S. Department of Labor defines a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[78]

143.    Similarly, the IRS defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[79]    Thus, an interest rate is reasonable if it is based on a fair market valuation.

144.    In contrast, the Merrill Lynch Sweep Program paid below-market interest rates throughout the relevant time period.    Most interest rates currently range from 0.01% to 0.15%

---

[77]    *Id.*

[78]    Grant of Individual Exemptions, 68 Fed. Reg. 34646 (June 10, 2003).

[79]    26 CFR §1.482-2(a)(2).

depending on the amount deposited by a customer.[80]  These miniscule rates are ***significantly*** below several objective benchmarks of reasonableness:

- **Competitors' Sweep Programs**.  The Merrill Lynch Defendants' sweep interest rates were far below fair market value, as demonstrated by the rates paid by their competitors, who offered FDIC-insured sweep accounts similar to those in the Merrill Lynch Sweep Program.  For example, competitor Moomoo's rate currently is 4.1%,[81] Webull's rate is 3.75%,[82] Vanguard's rate is 3.90%,[83] Fidelity's rate is 2.21%,[84] and Robert W. Baird's rate is between 1.37% and 2.83%.[85]

- **The Merrill Lynch Defendants' Other Interest-Bearing Accounts**.  Further, the sweep interest rates paid by the Merrill Lynch Sweep Program were far lower than the interest rates paid by the Merrill Lynch Defendants' other products outside of the Merrill Lynch Sweep Program.  For example, Merrill Lynch's Insured Savings Account (ISA) currently pays 3.54%, Merrill Lynch's Preferred Deposit account pays 4.24%, and money market mutual funds offered by Merrill Lynch pay from 2.58% to 4.63%.[86]

- **Federal Funds Rate**.  The sweep interest rates in the Merrill Lynch Sweep Program were also far below the U.S. Federal Reserve's benchmark federal funds rate, currently at 4.25% to 4.50%.[87]

---

[80]    Merrill, *Cash Management Solutions*, https://olui2.fs.ml.com/Publish/Content/application/pdf/GWMOL/ICCRateSheet.pdf (2024).    Account Tiers 1-4 of Merrill Lynch Sweep Program received interest rates ranging from 0.01% to 0.15% depending on the amount deposited, while account Tier 5, which was limited to certain eligible retirement plan and investment advisory accounts, received an interest rate of 4.29%.  *Id.*

[81]    Moomoo, *Boost your uninvested cash with 4.35% APY*, *supra* note 31.

[82]    Webull, *Webull High-Yield Case Management*, *supra* note 32.

[83]    Vanguard, *What's the Vanguard Cash Plus Account*, *supra* note 33.

[84]    Fidelity, *Fidelity Individual Retirement Accounts (IRA)*, *supra* note 34.

[85]    Baird, *Cash Sweep Program*, *supra* note 35.

[86]    Merrill, *Cash Management Solutions*, *supra* note 80 at 1-3.

[87]    Federal Reserve, *Economy at a Glance – Policy Rate*, *supra* note 37.

- **Three-Month Treasury Bill Rate**.  The sweep interest rates in the Merrill Lynch Sweep Program were far below the three-month U.S. treasury bill rate, currently at 4.23%.[88]

- **Repurchase Rate**.  The sweep interest rates in the Merrill Lynch Sweep Program were well below the overnight interest rate at which the U.S. Federal Reserve repurchases securities from private banks (*i.e.*, the repo rate), which is currently 4.25%.[89]

145.    These benchmarks individually and collectively demonstrated that the sweep interest rates in the Merrill Lynch Sweep Program were unreasonable.  As a result, Plaintiff and the Merrill Lynch Class (defined below) suffered damages by receiving far lower interest payments than they would have received if the sweep interest rates were reasonable.

**The Merrill Lynch Defendants Breached Their Contractual Obligations and Fiduciary Duties Related to Their Sweep Program**

146.    Under the Merrill Lynch Program Documents, Merrill Lynch agreed to act as its customers' agent, and, thus, was contractually obligated to act in its customers' best interests in seeking and negotiating reasonable sweep interest rates under the Sweep Program.  In other words, reasonableness was implicit in the Merrill Lynch Program Documents and governed the sweep interest rates paid to customers in the Merrill Lynch Sweep Program.

147.    Moreover, the Merrill Lynch Defendants violated contractual duties to provide reasonable rates of return on their customers' cash balances in the Merrill Lynch Sweep Program pursuant to the IRC.  Specifically, the Merrill Traditional IRA Agreement stated: "As a non-bank custodian, we have been approved by the Internal Revenue Service (IRS) to administer your IRA, consistent with Section 408(a) of the [IRC].  IRS Publications 590-A and 590-B (or replacement

---

[88]    Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis*, *supra* note 38.

[89]    Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate: Treasury Securities Sold by the Federal Reserve in the Temporary Open Market Operations*, *supra* note 39.

publications) contains helpful information about your IRA and related tax topics.  Visit irs.gov online or contact any IRS to request a copy."[90]

148.    Similarly, the Merrill Roth IRA Agreement stated: "For more information about taxes and your Roth IRA, you should obtain a copy of IRS Publication 590-A, Contributions to Individual Retirement Arrangements (IRAs) and 590-B, Distributions from Individual Retirement Arrangements (IRAs), or replacement publications."[91]   The Merrill Roth IRA Agreement also acknowledged that Merrill Lynch is "acting as a fiduciary under Title I of [ERISA] and Section 4975 of the [IRC] (Section 4975) in its capacity as a broker-dealer when it provides investment advice and makes recommendations to you regarding securities or investment strategies in your Roth IRA."[92]

149.    Summarizing IRC rules concerning IRAs, IRS Publication 590 states that "disqualified persons include your fiduciary," such as anyone who "[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets," and that "prohibited transactions" are "any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person."[93]

150.    IRC Section 4975 states that a "disqualified person" includes a "fiduciary" and "a person providing services to the [IRA] plan" and that "prohibited transaction[s]" include any direct or indirect "transfer to, or use by or for the benefit of, a disqualified person of the income or assets

---

[90]    Merrill Lynch, *Traditional IRA Disclosure Statement*, *supra* note 68 at 2-3.

[91]    Merrill Lynch, *Roth Individual Retirement Account (Roth IRA)*, *supra* note 69 at 16.

[92]    *Id.* at 9.

[93]    Department of the Treasury, Internal Revenue Service, *Distributions from Individual Retirement Arrangements (IRAs)*, *supra* note 45.

of a plan"; "act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account"; or "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan"[94]  The IRC provides limited "exemptions" for these prohibited transactions, including "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution."[95]

151.    Under these provisions of the IRC, the Merrill Lynch Defendants were "disqualified person[s]" and cash sweeps from IRA accounts to their affiliates, the Merrill Affiliated Banks, for the benefit of the Merrill Lynch Defendants and the Merrill Affiliated Banks, were "prohibited transactions."  The cash sweeps were not exempt because the Merrill Affiliated Banks did not pay reasonable sweep interest rates, as discussed above.  Therefore, the Merrill Lynch Defendants' Sweep Program transactions violated the IRC and the contractual provisions of the Merrill Lynch Sweep Program Documents that incorporated the IRC.

152.    Further, the Merrill Lynch Defendants' conduct related to the Merrill Lynch Sweep Program violated their fiduciary duties.  As an investment advisor, Merrill Lynch owed fiduciary

---

[94]    26 U.S.C. §4975(c) (1) (D) -(F), (e)(2).

[95]    26 U.S.C. §4975(d)(4).  Department of the Treasury regulations confirm that, under the IRC, investing retirement plan assets in deposits in a disqualified bank is exempted only if the deposits "bear[] a reasonable rate of interest" and, "in the case of a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization must name the institution and "state that [it] . . . may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)."  26 C.F.R. §54.4975-6(b)(1), (3); *see also* 29 U.S.C. §1108(b)(4) (similar rule under ERISA Section 408(b)(4) exempting interested party transactions involving the investment of IRA assets in bank deposits only if the deposits "bear a reasonable interest rate").

duties to their clients under the Advisers Act.[96]  Consistent with these fiduciary duties, the Bank

Deposit Program Documents stated that Merrill Lynch was obligated to "serve the best interest of

its client and not subordinate its client's interest to its own" and was not permitted to "place its

own interests ahead of the interests of its client."[97]

153.    Merrill Lynch owed similar duties of care under Regulation Best Interest, which

required it to act in its retail customers' best interests and prohibited Merrill Lynch from placing

its own interests ahead of its retail customers' interests.[98]

154.    However, as discussed above, Merrill Lynch violated these contractual and

fiduciary duties by failing to act in its customers' best interests when it provided customers with

unreasonably low sweep interest rates in comparison to several objective benchmarks discussed

above, including the sweep interest rates paid by competitors and the federal funds rates.

155.    Acknowledging these issues, in July 2024, BofA added new language to its Form

10-Q stating that "the rates paid on uninvested cash in investment advisory accounts that is swept

into interest paying bank deposits" were among the "risks and uncertainties" that BofA investors

should consider.[99]

---

[96]    *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for
Investment Advisers, 84 Fed. Reg. 134, 17 CFR §276 (July 12, 2019) (interpreting Section 206 of the
Advisers Act, 15 U.S.C. §80b-6).

[97]    *Id.*

[98]    *See* Securities and Exchange Commission, Regulation Best Interest: The Broker-Dealer Standard of
Conduct, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

[99]    Bank of America Corporation, Form 10-Q, at 2, https://investor.bankofamerica.com/regulatory-and-
other-filings/all-sec-filings/content/0000070858-24-000208/bac-20240630.htm (July 30, 2024).

**The Merrill Lynch Defendants Made Material Misrepresentations and Omissions
Regarding Their Sweep Programs**

156.    In the Merrill Lynch Program Documents, the Merrill Lynch Defendants made

material omissions by failing to disclose that, as discussed above, they established and used the

Merrill Lynch Sweep Program to enrich themselves by paying unreasonably low interest rates to

customers in order to increase their financial benefits.

157.    The Merrill Lynch Sweep Program Documents also misleadingly stated that "***from

time to time***" the Merrill Deposit Account interest rates "will ***likely be*** lower than yields on certain

money market funds and other cash alternatives"[100] and that the Merrill Deposit Account interest

rates "[w]ill ***likely be*** lower than the rates available on other deposit type accounts at the Merrill

Affiliated Banks and other banking institutions and yields on cash alternatives, such as money

market funds."[101]  These statements were misleading and omitted material facts because, in reality,

the Merrill Deposit Account interest rates were ***always*** unreasonably low and significantly below

market interest rates available on other deposit-type accounts and cash alternatives.

158.    The Merrill Lynch Defendants also misleadingly claimed that they "adopted

various policies and procedures reasonably designed to prevent the cash sweep arrangement and

other business arrangements from affecting the nature of the advice we and our financial advisors

provide"[102] when, in fact, such arrangements harmed customers by causing Defendants to

---

[100]  Merrill Lynch, *Client Relationship Summary*, *supra* note 61; Merrill Lynch, *Best Interest Disclosure
Statement*, *supra* note 62.

[101]  Merrill Lynch, *Sweep Program Guide*, *supra* note 64; *see also* Merrill Lynch, *Traditional IRA
Disclosure Statement*, *supra* note 68 at 39 ("The interest rate you earn in a bank deposit account affiliated
with the Sweep Program will likely be lower than yields on certain money market funds and other cash
alternatives"); Merrill Lynch, *Roth Individual Retirement Account (Roth IRA)*, *supra* note 69 at 36 (same).

[102]  Merrill Lynch, *Client Relationship Summary*, *supra* note 61.

automatically sweep customer deposits into Merrill Deposit Accounts paying unreasonably low, below-market interest rates.

159.    Moreover, the Merrill Lynch Defendants' statements about potentially ***lower*** interest rates do not excuse their contractual and fiduciary obligations to pay ***reasonable*** interest rates, as described above.  These statements must be construed harmoniously with the Merrill Lynch Defendants' contractual and fiduciary obligations.

**The Merrill Lynch Defendants Violated the RICO Statute**

160.    The Merrill Lynch Defendants violated the RICO Statute through their implementation of the Merrill Lynch Sweep Program.

161.    Merrill Lynch was an "enterprise" within the meaning of the RICO Statute. Through Merrill Lynch, the Merrill Lynch Defendants knowingly and intentionally devised and operated the Merrill Lynch Sweep Program as a scheme to defraud customers, including Plaintiff and the Merrill Lynch Class (defined below).  The Merrill Lynch Defendants used the Merrill Lynch Sweep Program to benefit and enrich themselves through, among other things, the payment of unreasonably low interest rates to customers on money deposited into the Merrill Lynch Sweep Program.

162.    The Merrill Lynch Sweep Program involved commercial activities across state lines, including the Merrill Lynch Defendants' distribution of the Merrill Lynch Program Documents to customers, and the Merrill Lynch Defendants' receipt and transfer of money deposited by customers.

163.    Through the Merrill Lynch Sweep Program, the Merrill Lynch Defendants conducted and participated in a pattern of Racketeering Acts.  The Merrill Lynch Defendants' Racketeering Acts included indictable, predicate offenses under 18 U.S.C. §§1341 and 1343 based on the Merrill Lynch Defendants' fraudulent use of interstate mail and wire communications,

including posting the materially false and misleading Merrill Lynch Program Documents on the public websites of E*TRADE and Merrill Lynch and distributing them to customers throughout the country.

164.    The Racketeering Acts were related in that they were taken in furtherance of the Merrill Lynch Defendants' Sweep Program scheme.  The Racketeering Acts occurred, and continue to occur, regularly and continuously over a multi-year period during the operation of the Merrill Lynch Sweep Program.

165.    The Merrill Lynch Defendants' conduct and the Racketeering Acts were part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  The Merrill Lynch Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Program scheme, including posting the materially false and misleading Program Documents on the public website of Merrill Lynch and distributing them to customers throughout the country.

166.    As Merrill Lynch Sweep Program customers, Plaintiff and the Merrill Lynch Class (defined below) were damaged by the Merrill Lynch Defendants' Racketeering Acts due to the Merrill Lynch Defendants' payment of unreasonably low interest rates on the money customers deposited into the Merrill Lynch Sweep Program.

**CLASS ACTION ALLEGATIONS AGAINST THE MERRILL LYNCH DEFENDANTS**

167.    Plaintiff brings this action against the Merrill Lynch Defendants as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all customers who had cash deposits or balances in one of the Merrill Lynch Sweep Program ("Merrill Lynch Class").  Excluded from the Merrill Lynch Class are the Merrill Lynch Defendants, officers

and directors of the Merrill Lynch Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Merrill Lynch Defendants have or had a controlling interest.

168.    The Merrill Lynch Class members are so numerous that their individual joinder is impracticable.  While the exact number of Merrill Lynch Class members can only be determined by appropriate discovery, Plaintiff believes that Merrill Lynch Class members number in the thousands, and are geographically dispersed, because Merrill Lynch oversees approximately $3.2 trillion in client assets worldwide.

169.    Plaintiff's claims are typical of Merrill Lynch Class members' claims because Plaintiff's cash deposits were subject to the Merrill Lynch Sweep Program, and, therefore, Plaintiff's claims, and those of all other Merrill Lynch Class members, arose from the same wrongful conduct by the Merrill Lynch Defendants alleged herein.

170.    Plaintiff will fairly and adequately protect the interests of the Merrill Lynch Class members and has retained counsel experienced and competent in complex class action litigation. Plaintiff has no interests that are contrary to, or in conflict with, the members of the Merrill Lynch Class that Plaintiff seeks to represent.

171.    The prosecution of separate actions by individual Merrill Lynch Class members would create a risk of inconsistent or varying adjudications with respect to individual Merrill Lynch Class members that would establish incompatible standards of conduct for the party opposing the Merrill Lynch Class or a risk of adjudications that, as a practical matter, would be dispositive of the interests of other Merrill Lynch Class members who were not parties to the adjudications or would substantially impair or impede the ability of such Merrill Lynch Class members to protect their interests.

172.    Because the Merrill Lynch Defendants act or refuse to act on grounds that apply generally to the Merrill Lynch Class, final injunctive relief or corresponding declaratory relief is appropriate with respect to the Merrill Lynch Class as a whole.

173.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Merrill Lynch Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Merrill Lynch Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

174.    Questions of law and fact common to the members of the Merrill Lynch Class predominate over any questions that may affect only individual members in that the Merrill Lynch Defendants act on grounds generally applicable to the entire Merrill Lynch Class.  Among the questions of law and fact common to the Merrill Lynch Class are:

(a)    whether the Merrill Lynch Defendants violated the laws as alleged herein;

(b)    whether Merrill Lynch owed fiduciary duties to Plaintiff and members of the Merrill Lynch Class in connection with the Merrill Lynch Sweep Program;

(c)    whether Merrill Lynch breached its fiduciary duties to Plaintiff and members of the Merrill Lynch Class in connection with the Merrill Lynch Sweep Program;

(d)    whether Merrill Lynch breached its contractual obligations to Plaintiff and members of the Merrill Lynch Class in connection with the Merrill Lynch Sweep Program;

(e)    whether the Merrill Lynch Defendants violated the Advisers Act;

(f)    whether the Merrill Lynch Defendants violated the RICO Statute;

(g)    whether the Merrill Lynch Defendants made material misrepresentations and/or omissions in connection with the Merrill Lynch Sweep Program;

(h)    whether the Merrill Lynch Defendants were unjustly enriched by their wrongful conduct;

(i)    whether the members of the Merrill Lynch Class sustained damages as a result of the alleged wrongful conduct by the Merrill Lynch Defendants, and, if so, the appropriate measure of damages; and

(j)    whether the members of the Merrill Lynch Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

## COUNT X

## BREACH OF FIDUCIARY DUTY AGAINST ALL MERRILL LYNCH DEFENDANTS

175.    Plaintiff incorporates paragraphs 129-174 above as though fully set forth herein.

176.    During the relevant time period, Merrill Lynch was the agent of, and investment advisor to, customers enrolled in the Merrill Lynch Sweep Program, including Plaintiff and the Merrill Lynch Class.  BofA owned and controlled Merrill Lynch.

177.    Merrill Lynch owed fiduciary duties to Plaintiff and the Merrill Lynch Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Merrill Lynch Class.

178.    Merrill Lynch violated its duties to act in the best interests of Plaintiff and the Class by using the Merrill Lynch Sweep Program to enrich itself, BofA, and the Merrill Lynch Sweep Banks at the expense of customers who were paid unreasonably low interest rates, as described above.

179.   Merrill Lynch also violated its duties to deal fairly and honestly with Plaintiff and the Merrill Lynch Class by making material misrepresentations and omissions in the Merrill Lynch Program Documents, as described above.

180.   Further, Merrill Lynch violated its duties to act with reasonable care to verify the truthfulness of the information set forth in the Merrill Lynch Sweep Program, which were materially misleading and omit material facts for the reasons described above.

181.   As a direct and proximate result of Merrill Lynch's breaches of fiduciary duties, Plaintiff and the Merrill Lynch Class suffered damages and are entitled to recover such damages from the Merrill Lynch Defendants.

## COUNT XI

## VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940 AGAINST ALL MERRILL LYNCH DEFENDANTS

182.   Plaintiff incorporates paragraphs 129-174 above as though fully set forth herein.

183.   During the relevant time period, Merrill Lynch was registered as an investment adviser under the Advisers Act.  BofA owned and controlled Merrill Lynch.

184.   Merrill Lynch violated Section 206 of the Advisers Act by failing to serve the best interests of their clients, Plaintiff and the Merrill Lynch Class, and by placing their own interests ahead of Plaintiff's and the Merrill Lynch Class's interests in connection with the Merrill Lynch Sweep Program, as further alleged herein.   *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019).

185.   The Merrill Lynch Program Documents should be deemed void pursuant to Section 215 of the Advisers Act, which provides that every:

(b) . . . contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of,

or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

186.    Accordingly, Plaintiff seeks rescission of the Merrill Lynch Program Documents and restitution of the consideration given pursuant to their purported terms.

**COUNT XII**

**BREACH OF CONTRACT AGAINST ALL MERRILL LYNCH DEFENDANTS**

187.    Plaintiff incorporates paragraphs 129-174 above as though fully set forth herein.

188.    Plaintiff and Merrill Lynch Class members were parties to the Merrill Lynch Program Documents with Merrill Lynch.  The Merrill Lynch Program Documents set forth the contractual terms and conditions of the Merrill Lynch Sweep Program.  BofA owned and controlled Merrill Lynch.

189.    Pursuant to the Merrill Lynch Program Documents, Merrill Lynch was contractually obligated to act as an agent on behalf of Plaintiff and the Merrill Lynch Class, and, thus, was contractually obligated to act in Plaintiff's and the Merrill Lynch Class's best interests in seeking and negotiating reasonable sweep interest rates under the Merrill Lynch Sweep Program.

190.    Merrill Lynch breached its contractual obligations by failing to provide Plaintiff and the Merrill Lynch Class with reasonable interest rates on their deposits in the Merrill Lynch Sweep Program.  Rather, the sweep interest rates provided by Merrill Lynch were below market and unreasonably low.  As such, Merrill Lynch denied Plaintiff and the Merrill Lynch Class the full benefit of their bargain under the Merrill Lynch Program Documents.

191.    As a direct and proximate result of Merrill Lynch's breach of contract, Plaintiff and the Merrill Lynch Class sustained damages.

## COUNT XIII

### BREACH OF IMPLIED COVENANT OF GOOD FAITH
### AND FAIR DEALING AGAINST ALL MERRILL LYNCH DEFENDANTS

192.    Plaintiff incorporates paragraphs 129-174 above as though fully set forth herein.

193.    Plaintiff and Merrill Lynch Class members were parties to the Merrill Lynch Program Documents with Merrill Lynch.  The Merrill Lynch Program Documents set forth the contractual terms and conditions of the Merrill Lynch Sweep Program.  BofA owned and controlled Merrill Lynch.

194.    Implicit in the Merrill Lynch Program Documents were duties of good faith and fair dealing.

195.    Merrill Lynch breached its duties of good faith and fair dealing by failing to provide Plaintiff and the Merrill Lynch Class with fair and reasonable sweep interest rates on their cash sweep balances in the Merrill Lynch Sweep Program.  Rather, the interest rates provided by Merrill Lynch were below market and unreasonably low.  As such, Merrill Lynch denied Plaintiff and the Merrill Lynch Class the full benefit of their bargain under the Merrill Lynch Program Documents.

196.    As a direct and proximate result of Merrill Lynch's breaches of the implied covenants of good faith and fair dealing, Plaintiff and the Merrill Lynch Class sustained damages.

## COUNT XIV

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
### ORGANIZATIONS ACT, 18 U.S.C. §1962(c)-(d),
### AGAINST ALL MERRILL LYNCH DEFENDANTS

197.    Plaintiff incorporates paragraphs 129-174 above as though fully set forth herein.

198.    This claim arises under 18 U.S.C. §1962(c)-(d) of the RICO Statute, which provide in relevant part:

> (c)    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

> (d)    It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

199.    At all relevant times, the Merrill Lynch Defendants were "person[s]" because they are capable of holding a legal or beneficial interest in property.

200.    During the relevant time period, Merrill Lynch were enterprises engaged in interstate commerce.  Through Merrill Lynch, the Merrill Lynch Defendants knowingly and intentionally devised and operated the Merrill Lynch Sweep Program as schemes to defraud investors.  The Merrill Lynch Defendants used the Merrill Lynch Sweep Program to enrich themselves and the Merrill Lynch Sweep Banks by paying unreasonably low interest rates to Sweep Program customers.

201.    The Merrill Lynch Defendants conducted and participated in multiple, related Racketeering Acts for the purpose of implementing the Merrill Lynch Sweep Program.  The Racketeering Acts, which occurred, and continue to occur, regularly and continuously during the operation of the Merrill Lynch Sweep Program over a multi-year period, constituted a "pattern of racketeering activity."  The Racketeering Acts were made possible by the regular, repeated, and continuous use of the employees, facilities, and services of Merrill Lynch.

202.    The Merrill Lynch Defendants' Racketeering Acts included the following indictable, predicate offenses:

(a)    **Mail Fraud**: The Merrill Lynch Defendants violated 18 U.S.C. §1341 by sending and receiving materials via United States mail and commercial interstate carriers for the

purpose of conducting the fraudulent Sweep Program scheme, including the Merrill Lynch Program Documents.  As described above, the Merrill Lynch Program Documents contained material misrepresentations and omissions knowingly and intentionally made by the Merrill Lynch Defendants for the purpose of defrauding customers.

(b)    **Wire Fraud**: The Merrill Lynch Defendants violated 18 U.S.C. §1343 by transmitting and receiving writings and sounds by means of interstate wire communication for the purpose of conducting the fraudulent Sweep Program scheme.  The writings included the Merrill Lynch Program Documents, which were posted on Merrill Lynch's public website.  As described above, the Merrill Lynch Program Documents contained material misrepresentations and omissions knowingly and intentionally made by the Merrill Lynch Defendants for the purpose of defrauding customers.

203.    The Merrill Lynch Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  The Merrill Lynch Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Program scheme, including mailing and transmitting the Merrill Lynch Program Documents to customers.

204.    Plaintiff and the Merrill Lynch Class suffered damages by reason of the Merrill Lynch Defendants' payment of unreasonably low interest rates on their Sweep Program deposits, in violation of 18 U.S.C. §1962(c)-(d).

205.    Plaintiff's and the Merrill Lynch Class's injuries were directly and proximately caused by the Merrill Lynch Defendants' racketeering activity.

## COUNT XV

### NEGLIGENCE AGAINST ALL MERRILL LYNCH DEFENDANTS

206.    Plaintiff incorporates paragraphs 129-174 above as though fully set forth herein.

207.    During the relevant time period, Merrill Lynch was the agent of, and investment advisor to, customers enrolled in the Merrill Lynch Sweep Program, including Plaintiff and the Merrill Lynch Class.  BofA owned and controlled Merrill Lynch.

208.    The Merrill Lynch Defendants owed Plaintiff and the Merrill Lynch Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Merrill Lynch Sweep Program.

209.    The Merrill Lynch Defendants' conduct with respect to the Merrill Lynch Sweep Program, as described above, was negligent.  By failing to provide Plaintiff and the Merrill Lynch Class with fair and reasonable sweep interest rates on their cash sweep balances in the Merrill Lynch Sweep Program, the Merrill Lynch Defendants breached their duty to act with reasonable care.

210.    The Merrill Lynch Defendants' negligence directly and proximately caused harm to Plaintiff and the Merrill Lynch Class.

## COUNT XVI

### NEGLIGENT MISREPRESENTATIONS AND OMISSIONS AGAINST ALL MERRILL LYNCH DEFENDANTS

211.    Plaintiff incorporates paragraphs 129-174 above as though fully set forth herein.

212.    During the relevant time period, Merrill Lynch was the agent of, and investment advisor to, customers enrolled in the Merrill Lynch Sweep Program, including Plaintiff and the Merrill Lynch Class.  BofA owned and controlled Merrill Lynch.

213.    The Merrill Lynch Defendants owed Plaintiff and the Merrill Lynch Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Merrill Lynch Sweep Program.

214.    The Merrill Lynch Defendants negligently made material misrepresentations and omissions in the Merrill Lynch Program Documents, as described above, which were posted on Merrill Lynch's public website.

215.    Plaintiff and the proposed Merrill Lynch Class justifiably relied on the Merrill Lynch Program Documents and accordingly deposited and maintained cash balances in the Merrill Lynch Sweep Program to their detriment.

216.    The Merrill Lynch Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the proposed Merrill Lynch Class.

## COUNT XVII

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW §349 AGAINST ALL MERRILL LYNCH DEFENDANTS

217.    Plaintiff incorporates paragraphs 129-174 above as though fully set forth herein.

218.    The Merrill Lynch Defendants' acts and practices with respect to the Merrill Lynch Sweep Program, as described above, constituted unlawful, unfair, misleading, and deceptive business acts and practices in violation of Section 349 of the GBL.

219.    The Merrill Lynch Defendants' misleading and deceptive business acts and practices with respect to the Merrill Lynch Sweep Program adversely impacted Plaintiff and the Merrill Lynch Class, and, therefore, constituted consumer-oriented conduct under GBL §349, which resulted in direct harm to Plaintiff and the Merrill Lynch Class.

220.    Accordingly, Plaintiff and the Merrill Lynch Class seek appropriate relief under GBL §349, including injunctive relief and damages.

## COUNT XVIII

## UNJUST ENRICHMENT AGAINST ALL MERRILL LYNCH DEFENDANTS

221.    Plaintiff incorporates paragraphs 129-174 above as though fully set forth herein.

222.    The Merrill Lynch Defendants financially benefitted from the unlawful acts alleged herein by paying Plaintiff and the Merrill Lynch Class unreasonably low and below market interest payments on their Sweep Program balances.  These unlawful acts caused Plaintiff and the Merrill Lynch Class to suffer injury and monetary loss.

223.    As a result of the unlawful acts alleged herein, the Merrill Lynch Defendants were unjustly enriched at the expense of Plaintiff and the Merrill Lynch Class.

224.    The Merrill Lynch Defendants have received, and are holding, funds belonging to Plaintiff and the Merrill Lynch Class, which in equity the Merrill Lynch Defendants should not be permitted to keep but should be required to refund to Plaintiff and the Merrill Lynch Class.

## THE SCHWAB SWEEP PROGRAMS

**Background on the Schwab Sweep Programs**

225.    During the relevant time period, Charles Schwab's wholly owned subsidiary, CS&Co., offered brokerage and investment advisory services to customers nationwide.  Through CS&Co, the Schwab Defendants offered their customers Sweep Programs called the Bank Sweep Program and, for retirement accounts, the Bank Sweep for Benefit Plans Program,

226.    The terms and conditions of the Bank Sweep Program were set forth in the Schwab Account Agreement,[103] the Cash Features Program Disclosure Statement[104] ("Schwab Disclosure

---

[103]  Charles Schwab, *Schwab Account Agreement*, https://www.schwab.com/resource/schwab-account-agreement (Oct. 2024).

[104]  Charles Schwab, *Cash Features Program Disclosure Statement*, https://www.schwab.com/resource/cash-features-program-disclosure-statement (July 2024).

Statement"), and the Cash Features Program General Terms and Conditions[105] ("Schwab Program Terms") (collectively, "Schwab Bank Sweep Program Documents"), which were posted on the public website of Charles Schwab.  The Schwab Account Agreement was governed by the laws of the State of California and incorporated the terms of the Schwab Disclosure Statement.

227.    The terms and conditions of the Bank Sweep for Benefit Plans Program were set forth in the Schwab Retirement Plan Brokerage Account Documents, the Schwab IRA and ESA Account Agreement[106] ("Schwab IRA Agreement"), the Schwab Disclosure Statement,[107] the Schwab Program Terms,[108] and the Bank Sweep for Benefit Plans summary[109] ("Benefit Plans Summary") (collectively, "Schwab Bank Sweep Program Retirement Documents" and, together with the Schwab Bank Sweep Program Documents, "Schwab Sweep Program Documents").  The Schwab Retirement Plan Brokerage Account Documents and Schwab IRA Agreement were governed by the laws of the State of California and incorporated the terms of the Schwab Disclosure Statement.

228.    Under the Schwab Sweep Program Documents, CS&Co. automatically swept eligible clients' uninvested cash balances into interest-bearing deposit accounts ("Schwab Deposit Accounts") with a network of bank partners selected by the Schwab Defendants ("Schwab Program Banks"), including at least three banks affiliated with the Schwab Defendants: Charles

---

[105]    Charles    Schwab,    *Cash    Features    Program    General    Terms    and    Conditions*, https://www.schwab.com/public/file/P-7036303 (last visited Jan. 2, 2025).

[106]    Charles    Schwab,    *Schwab    IRA    and    ESA    Account*    Agreement, https://www.schwab.com/resource/schwab-ira-esa-account-agreement (Oct. 2024).

[107]    Charles Schwab, *Cash Features Program Disclosure Statement*, *supra* note 104.

[108]    Charles Schwab, *Cash Features Program General Terms and Conditions*, *supra* note 105.

[109]    Charles Schwab, *Bank Sweep for Benefit Plans*, https://www.schwab.com/public/file/P-10503562 (Jan. 2025).

Schwab Bank, SSB; Charles Schwab Premier Bank, SSB; and Charles Schwab Trust Bank ("Schwab Affiliated Banks").[110]  Funds in the Schwab Deposit Accounts were insured by the FDIC.[111]

229.    The Schwab Sweep Program Documents provided that CS&Co. would act as an agent for customers in the Schwab Sweep Programs, stating, "[CS&Co.] is acting as your agent in establishing the Deposit Accounts with the Program Banks and in depositing and withdrawing funds"[112] and "[y]ou authorize us to act as your agent to make deposits to and withdrawals from deposit accounts at one or more banks . . . in accordance with the Cash Features Program Disclosure Statement."[113]

230.    The sweep interest rates paid to customers in the Schwab Sweep Programs were set by the Schwab Affiliated Banks.[114]

**The Schwab Defendants Reaped Significant Benefits from Their Sweep Programs to the Detriment of Their Customers, Who Were Paid Unreasonably Low Interest Rates**

231.    The Schwab Sweep Programs provided highly lucrative financial benefits to the Schwab Defendants and their Affiliated Banks.  The Schwab Affiliated Banks used customer deposits in the Schwab Sweep Programs to "fund current and new investments" and "fund current and new lending activities."[115]

---

[110]  Charles Schwab, *Cash Features Program Disclosure Statement*, *supra* note 104 at 6-7.

[111]  *Id.* at 6.

[112]  *Id.* at 11.

[113]  Charles Schwab, *Schwab Account Agreement*, *supra* note 103 at 52.

[114]  Charles Schwab, *Cash Features Program General Terms and Conditions*, *supra* note 105 at 1-2.

[115]  *Id.* at 23.

232.    The Schwab Defendants described the profitability of such investment and lending

activities as follows:

> The profitability on such activities is generally measured by the difference, or
> "spread," between the interest rate paid on the Deposit Accounts and other costs of
> maintaining the Deposit Accounts, and the interest rate and other income earned by
> an Affiliated Program Bank on the loans and investments made with the funds in
> the Deposit Accounts. . . .  The cash balances can also be used to provide funds to
> develop products and services for Schwab-affiliated companies to the extent
> permitted by applicable law.[116]

233.    The Schwab Defendants further admitted that this "spread" caused "[c]onflicts of

[i]nterest" because "[i]nterest rates paid on Bank Sweep may be set as low as possible."[117]  In other

words, by increasing the spread through lower interest payments to customers, the Schwab

Defendants and their Affiliated Banks were able to increase their profits from the Schwab Sweep

Programs.

234.    The Schwab Defendants also benefitted from "an annual per account flat fee" that

the Schwab Affiliated Banks paid to CS&Co. for "administrative services" and a similar fee from

other Schwab Program Banks "based upon the total amount of dollars swept to that Program

Bank."[118]  CS&Co. and certain of its affiliates also "receive[d] compensation" from Schwab

Affiliated Banks in exchange for "operational, technology, and other services to the Affiliate

Banks and for those services."[119]  These arrangements resulted in lower interest payments to

customers in the Schwab Sweep Programs: "Affiliate Banks consider the amounts paid to

---

[116]  Charles Schwab, *Cash Features Program Disclosure Statement*, *supra* note 104 at 20.

[117]  *Id.* at 23.  The SEC also recognized that "cash sweep programs" are a "common source[] of conflicts
of interest."  U.S. Securities and Exchange Commission, Staff Bulletin:  Standards of Conduct for Broker-
Dealers and Investment Advisers Conflicts of Interest (Sept. 9, 2024), https://www.sec.gov/tm/iabd-staff-
bulletin-conflicts-interest.

[118]  Charles Schwab, *Cash Features Program General Terms and Conditions*, *supra* note 105 at 12.

[119]  *Id.*

[CS&Co.] and its affiliates when determining their all-in cost of funds from participating in the [Sweep] Program, which reduces the amount of interest they are willing to pay."[120]

235.     Additionally, CS&Co.'s employees and registered representatives could be "compensated in part, based directly or indirectly, on deposit balances" or based on the profitability of the Schwab Sweep Programs.[121]

236.     Due to these adverse financial incentives, the Schwab Defendants failed to negotiate and secure reasonable sweep interest rates for customers in the Schwab Sweep Programs. As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

237.     The U.S. Department of Labor defines a "reasonable" rate of interest as "a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated."[122]

238.     Similarly, the IRS defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."[123]   Thus, an interest rate is reasonable if it is based on a fair market valuation.

---

[120]   *Id.*

[121]   *Id.*

[122]   Grant of Individual Exemptions, 68 Fed. Reg. 34646 (June 10, 2003).

[123]   26 CFR §1.482-2(a)(2).

239.    In contrast, the Schwab Sweep Programs paid below-market interest rates throughout the relevant time period, currently at 0.15%.[124]  These miniscule rates are **significantly** below several objective benchmarks of reasonableness:

- **Competitors' Sweep Programs**.  The Schwab Defendants' sweep interest rates were far below fair market value, as demonstrated by the rates paid by their competitors, who offered FDIC-insured sweep accounts similar to those in the Charles Schwab Sweep Programs.  For example, competitor Moomoo's rate currently is 4.1%,[125] Webull's rate is 3.75%,[126] Vanguard's rate is 3.90%,[127] Fidelity's rate is 2.21%,[128] and Robert W. Baird's rate is between 1.37% and 2.83%.[129]

- **The Schwab Defendants' Other Interest-Bearing Accounts**.  Further, the sweep interest rates paid by the Schwab Sweep Programs were far lower than the interest rates paid by other Charles Schwab products outside of the Sweep Programs. Charles Schwab's money funds pay between 2.79% and 4.45%.[130]

- **Federal Funds Rate**.  The sweep interest rates in the Schwab Sweep Programs were also far below the U.S. Federal Reserve's benchmark federal funds rate, currently at 4.25% to 4.50%.[131]

- **Three-Month Treasury Bill Rate**.  The sweep interest rates in the Schwab Sweep Programs were far below the three-month U.S. treasury bill rate, currently at 4.23%.[132]

---

[124]  Charles Schwab, *Looking for more ways to put your cash to work?,* https://www.schwab.com/cash-investments (last visited Jan. 3, 2025); Charles Schwab, *Bank Sweep for Benefit Plans*, *supra* note 109.

[125]  Moomoo, *Boost your uninvested cash with 4.35% APY*, *supra* note 31.

[126]  Webull, *Webull High-Yield Case Management*, *supra* note 32.

[127]  Vanguard, *What's the Vanguard Cash Plus Account*, *supra* note 33.

[128]  Fidelity, *Fidelity Individual Retirement Accounts (IRA)*, *supra* note 34.

[129]  Baird, *Cash Sweep Program*, *supra* note 35.

[130]  Charles Schwab, *Looking for more ways to put your cash to work?*, *supra* note 124.

[131]  Federal Reserve, *Economy at a Glance – Policy Rate*, *supra* note 37.

[132]  Federal Reserve Bank of St. Louis, *3-Month Treasury Bill Secondary Market Rate, Discount Basis*, *supra* note 38.

- **Repurchase Rate**.  The sweep interest rates in the Schwab Sweep Programs were well below the overnight interest rate at which the U.S. Federal Reserve repurchases securities from private banks (*i.e.*, the repo rate), which is currently 4.25%.[133]

240.    These benchmarks individually and collectively demonstrated that the sweep interest rates in the Schwab Sweep Programs were unreasonable.  As a result, Plaintiff and the Charles Schwab Class (defined below) suffered damages by receiving far lower interest payments than they would have received if the sweep interest rates were reasonable.

**The Schwab Defendants Breached Their Contractual Obligations and Fiduciary Duties Related to Their Sweep Programs**

241.    Under the Schwab Program Documents, CS&Co. agreed to act as its customers' agent, and, thus, was contractually obligated to act in its customers' best interests in seeking and negotiating reasonable sweep interest rates under the Schwab Sweep Programs.  In other words, reasonableness was implicit in the Schwab Program Documents and governed the sweep interest rates paid to customers in the Schwab Sweep Programs.

242.    Moreover, the Schwab Defendants violated contractual duties to provide reasonable rates of return on their customers' cash balances in the Schwab Sweep Programs pursuant to the IRC and ERISA.  The Cash Features Terms stated that "[r]etirement accounts will be paid a ***reasonable*** rate consistent with applicable legal and regulatory requirements" and "[t]he interest rate on the Bank Sweep for Benefit Plans feature is set by our affiliated bank(s), which intend to pay interest consistent with ***reasonable*** rate provisions of applicable legal and regulatory requirements."[134]  Similarly, the Cash Features Disclosure Statement stated:  "Retirement and

---

[133]    Federal Reserve Bank of St. Louis, *Overnight Reverse Repurchase Agreements Award Rate:  Treasury Securities Sold by the Federal Reserve in the Temporary Open Market Operations*, *supra* note 39.

[134]    Charles Schwab, *Cash Features Program General Terms and Conditions*, *supra* note 105 at 1-2.

other benefit plan accounts will be paid a ***reasonable*** rate consistent with applicable legal and regulatory requirements."[135]

243.    The Schwab Retirement Plan Brokerage Account Documents and Schwab IRA Agreement stated that they "shall be interpreted as . . . consistent and in compliance with" Section 4975 of the IRC, which requires a reasonable rate of interest as discussed below.[136]  The Schwab Defendants further stated: "For further information on IRAs, you may wish to obtain IRS Publication 590-A, *Contributions to Individual Retirement Arrangements (IRAs),* or Publication 590-B, *Distributions from Individual Retirement Arrangements (IRAs),* by calling 1-800-TAX-FORM, or by visiting www.irs.gov on the Internet."[137]

244.    Summarizing IRC rules concerning IRAs, IRS Publication 590 states that "disqualified persons include your fiduciary," such as anyone who "[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets," and that "prohibited transactions" are "any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person."[138]

245.    IRC Section 4975 states that a "disqualified person" includes a "fiduciary" and "a person providing services to the [IRA] plan" and that "prohibited transaction[s]" include any direct or indirect "transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan"; "act by a disqualified person who is a fiduciary whereby he deals with the income or

---

[135]   Charles Schwab, *Cash Features Program Disclosure Statement*, *supra* note 104 at 10, 23.

[136]   Charles Schwab, *Schwab IRA and ESA Account Agreement*, *supra* note 106 at 4; Charles Schwab, *Schwab Retirement Plan Brokerage Account Documents*, at 3, https://www.schwab.com/public/file/P-647612/ (Oct. 2020).

[137]   Charles Schwab, *Schwab Retirement Plan Brokerage Account Documents*, *supra* note 136 at 18.

[138]   Department of the Treasury, Internal Revenue Service, *Distributions from Individual Retirement Arrangements (IRAs)*, *supra* note 45.

assets of a plan in his own interest or for his own account"; or "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan"[139]  The IRC provides limited "exemptions" for these prohibited transactions, including "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution."[140]

246.    Under these IRC provisions, the Schwab Defendants were "disqualified person[s]" and cash sweeps from retirement accounts to their affiliates, the Schwab Affiliated Banks, for the benefit of the Schwab Defendants and the Schwab Affiliated Banks, were "prohibited transactions."  The cash sweeps were not exempt because the Schwab Affiliated Banks did not pay reasonable sweep interest rates, as discussed above.

247.    With respect to ERISA, the Benefit Plans Summary stated: "Bank Sweep for Benefit Plans pays a bank-administered rate of interest that will be adjusted by Schwab's Program Banks based on market conditions.  The rate is intended to be consistent with ERISA *reasonable* rate standards for cash awaiting investment based on comparator deposit rates, while also considering available alternative options, competitive positioning, and other factors."[141]

---

[139]  26 U.S.C. §4975(c) (1) (D) -(F), (e)(2).

[140]  26 U.S.C. §4975(d)(4).  Department of the Treasury regulations confirm that, under the IRC, investing retirement plan assets in deposits in a disqualified bank is exempted only if the deposits "bear[] a reasonable rate of interest" and, "in the case of a bank or similar financial institution that invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization must name the institution and "state that [it] . . . may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)."  26 C.F.R. §54.4975-6(b)(1), (3); *see also* 29 U.S.C. §1108(b)(4) (similar rule under ERISA Section 408(b)(4) exempting interested party transactions involving the investment of IRA assets in bank deposits only if the deposits "bear a reasonable interest rate").

[141]  Charles Schwab, *Bank Sweep for Benefit Plan*s, *supra* note 109 at 1.

248.    Section 408 of ERISA exempts interested party transactions involving the investment of IRA assets in bank deposits only if they "bear a reasonable interest rate." This exemption did not apply because the Schwab Program Banks did not pay reasonable sweep interest rates.

249.    Thus, the Schwab Defendants' Sweep Program transactions violated the IRC, ERISA, and the contractual provisions of the Schwab Sweep Program Documents that incorporated the IRC and ERISA.

250.    Further, the Schwab Defendants' conduct related to their Sweep Programs violated their fiduciary duties. As investment advisors, CS&Co. owed fiduciary duties to their clients under the Advisers Act.[142] Consistent with these fiduciary duties, the Bank Deposit Program Documents stated that CS&Co. was obligated to "serve the best interest of its client and not subordinate its client's interest to its own" and was not permitted to "place its own interests ahead of the interests of its client."[143]

251.    CS&Co. owed similar duties of care under Regulation Best Interest, which required it to act in its retail customers' best interests and prohibited CS&Co. from placing its own interests ahead of its retail customers' interests.[144]

252.    However, as discussed above, CS&Co. violated these contractual and fiduciary duties by failing to act in its customers' best interests when it provided them with unreasonably

---

[142]    *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR §276 (July 12, 2019) (interpreting Section 206 of the Advisers Act, 15 U.S.C. §80b-6).

[143]    *Id.*

[144]    *See* Securities and Exchange Commission, Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33318, 33320, 17 C.F.R. §240.15l-1 (July 12, 2019).

low sweep interest rates in comparison to several objective benchmarks discussed above, including the sweep interest rates paid by competitors and the federal funds rates.

**The Schwab Defendants Made Material Misrepresentations and Omissions Regarding Their Sweep Programs**

253.    In the Schwab Program Documents, the Schwab Defendants made material omissions by failing to disclose that, as discussed above, they established and used the Schwab Sweep Programs to enrich themselves by paying unreasonably low interest rates to customers in order to increase their financial benefits.

254.    The Schwab Defendants made the additional misleading statements that "yields on any of our cash features ***can be lower*** than those of similar investments or deposit accounts offered outside the Cash Features Program."[145]  This statement was misleading and omitted material facts because, in reality, the Schwab Sweep Program yields were ***always*** significantly below market alternatives (*i.e.*, these were not mere possibilities that "can" occur).

255.    The Schwab Defendants also stated that "[i]nterest rates on the Deposit Accounts ***may be*** established at a rate as low as possible ***consistent with prevailing market and business conditions***" and "[t]he interest rate on the Bank Sweep feature is set by our affiliated bank(s), which also has the option to pay as low a rate as possible ***consistent with their views of competitive necessities***."[146]  These statements were false and misleading because the interest rates were ***always***

---

[145]    Charles Schwab, *Cash Features Program General Terms and Conditions*, *supra* note 105 at 2; *see also id.* at 1 (The interest rate on the Bank Sweep feature . . . . ***can be*** lower than some competitors' rates"); *id.* at 2 ("The interest rate on the Bank Sweep for Benefit Plans feature . . . . ***can be*** lower than some competitors' rates"); Charles Schwab, *Cash Features Program Disclosure Statement*, *supra* note 104 at 4 ("Cash Features are not intended for long-term investments and yields on any of Schwab's Cash Features ***can be*** lower than those of similar investments or deposit accounts offered outside of the Cash Features Program.").

[146] Charles Schwab, *Cash Features Program Disclosure Statement*, *supra* note 104 at 10; Charles Schwab, *Cash Features Program General Terms and Conditions*, *supra* note 105 at 1.

as low as possible and were not "consistent with prevailing market and business conditions" or based on "competitive necessities" but rather were established at below market and unreasonably low rates in order to enrich the Schwab Defendants and their Affiliated Banks at the expense of their Sweep Program customers.

256.    Additionally, as set forth above, the Schwab Defendants stated in several documents that retirement accounts would be paid a "reasonable" rate of interest consistent with applicable legal and regulatory requirements.  These statements were false and omitted material facts because, as discussed above, (a) the Schwab Defendants paid unreasonably low interest rates on cash swept from retirement accounts into the Schwab Program Banks, including the Schwab Affiliated Banks; and (b) such deposits were not in compliance with Section 4975 of the IRC or Section 408 of ERISA.

257.    Moreover, the Schwab Defendants' statements about potentially *lower* interest rates do not excuse their contractual and fiduciary obligations to pay *reasonable* interest rates, as described above.  These statements must be construed harmoniously with the Schwab Defendants' contractual and fiduciary obligations.

**The Schwab Defendants Violated the RICO Statute**

258.    The Schwab Defendants violated the RICO Statute through their implementation of the Schwab Sweep Programs.

259.    CS&Co. was an "enterprise" within the meaning of the RICO Statute.  Through CS&Co., the Schwab Defendants knowingly and intentionally devised and operated the Schwab Sweep Programs as a scheme to defraud customers, including Plaintiff and the Charles Schwab Class (defined below).  The Schwab Defendants used their Sweep Programs to benefit and enrich themselves through, among other things, the payment of unreasonably low interest rates to customers on money deposited into their Sweep Programs.

260.    The Schwab Sweep Programs involved commercial activities across state lines, including the Schwab Defendants' distribution of the Charles Schwab Program Documents to customers, and the Schwab Defendants' receipt and transfer of money deposited by customers.

261.    Through the Schwab Sweep Programs, the Schwab Defendants conducted and participated in a pattern of Racketeering Acts.  The Schwab Defendants' Racketeering Acts included indictable, predicate offenses under 18 U.S.C. §§1341 and 1343 based on the Schwab Defendants' fraudulent use of interstate mail and wire communications, including posting the materially false and misleading Charles Schwab Program Documents on the public website of Charles Schwab and distributing them to customers throughout the country.

262.    The Racketeering Acts were related in that they were taken in furtherance of the Schwab Defendants' Sweep Program scheme.  The Racketeering Acts occurred, and continue to occur, regularly and continuously over a multi-year period during the operation of the Schwab Sweep Programs.

263.    The Schwab Defendants' conduct and the Racketeering Acts were part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  The Schwab Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Program scheme, including posting the materially false and misleading Charles Schwab Program Documents on the public website of Charles Schwab and distributing them to customers throughout the country.

264.    As Charles Schwab Sweep Program customers, Plaintiff and the Charles Schwab Class (defined below) were damaged by the Schwab Defendants' Racketeering Acts due to the

Schwab Defendants' payment of unreasonably low interest rates on the money customers deposited into the Schwab Sweep Programs.

## CLASS ACTION ALLEGATIONS AGAINST THE SCHWAB DEFENDANTS

265.    Plaintiff brings this action against the Schwab Defendants as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all customers who had cash deposits or balances in the Schwab Sweep Programs ("Charles Schwab Class"). Excluded from the Charles Schwab Class are the Schwab Defendants, officers and directors of the Schwab Defendants at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Schwab Defendants have or had a controlling interest.

266.    The Charles Schwab Class members are so numerous that their individual joinder is impracticable.   While the exact number of Charles Schwab Class members can only be determined by appropriate discovery, Plaintiff believes that Charles Schwab Class members number in the thousands, and are geographically dispersed, because Charles Schwab oversees approximately $9.85 trillion in client assets worldwide.

267.    Plaintiff's claims are typical of Charles Schwab Class members' claims because Plaintiff's cash deposits were subject to the Schwab Sweep Programs, and, therefore, Plaintiff's claims, and those of all other Charles Schwab Class members, arose from the same wrongful conduct by the Schwab Defendants alleged herein.

268.    Plaintiff will fairly and adequately protect the interests of the Charles Schwab Class members and has retained counsel experienced and competent in complex class action litigation. Plaintiff has no interests that are contrary to, or in conflict with, the members of the Charles Schwab Class that Plaintiff seeks to represent.

269.    The prosecution of separate actions by individual Charles Schwab Class members would create a risk of inconsistent or varying adjudications with respect to individual Charles Schwab Class members that would establish incompatible standards of conduct for the party opposing the Charles Schwab Class or a risk of adjudications that, as a practical matter, would be dispositive of the interests of other Charles Schwab Class members who were not parties to the adjudications or would substantially impair or impede the ability of such Charles Schwab Class members to protect their interests.

270.    Because the Schwab Defendants act or refuse to act on grounds that apply generally to the Charles Schwab Class, final injunctive relief or corresponding declaratory relief is appropriate with respect to the Charles Schwab Class as a whole.

271.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Charles Schwab Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Charles Schwab Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

272.    Questions of law and fact common to the members of the Charles Schwab Class predominate over any questions that may affect only individual members in that the Schwab Defendants act on grounds generally applicable to the entire Charles Schwab Class.  Among the questions of law and fact common to the Charles Schwab Class are:

(a)    whether the Schwab Defendants violated the laws as alleged herein;

(b)    whether CS&Co. owed fiduciary duties to Plaintiff and members of the Charles Schwab Class in connection with the Schwab Sweep Programs;

(c)    whether CS&Co. breached its fiduciary duties to Plaintiff and members of the Charles Schwab Class in connection with the Schwab Sweep Programs;

(d)    whether CS&Co. breached its contractual obligations to Plaintiff and members of the Charles Schwab Class in connection with the Schwab Sweep Programs;

(e)    whether the Schwab Defendants violated the Advisers Act;

(f)    whether the Schwab Defendants violated the RICO Statute;

(g)    whether the Schwab Defendants made material misrepresentations and/or omissions in connection with the Schwab Sweep Programs;

(h)    whether the Schwab Defendants were unjustly enriched by their wrongful conduct;

(i)    whether the members of the Charles Schwab Class sustained damages as a result of the alleged wrongful conduct by the Schwab Defendants, and, if so, the appropriate measure of damages; and

(j)    whether the members of the Charles Schwab Class are entitled to attorneys' fees and costs and, if so, the appropriate amount of attorneys' fees and costs.

## COUNT XIX

## BREACH OF FIDUCIARY DUTY AGAINST ALL SCHWAB DEFENDANTS

273.    Plaintiff incorporates paragraphs 225-272 above as though fully set forth herein.

274.    During the relevant time period, CS&Co. was the agent of, and investment advisor to, customers enrolled in the Schwab Sweep Programs, including Plaintiff and the Charles Schwab Class.  Charles Schwab owned and controlled CS&Co.

275.    CS&Co. owed fiduciary duties to Plaintiff and the Charles Schwab Class, including duties to act in the best interests of, and deal fairly and honestly with, Plaintiff and the Charles Schwab Class.

276.    CS&Co. violated its duties to act in the best interests of Plaintiff and the Charles Schwab Class by using the Schwab Sweep Programs to enrich itself, Charles Schwab, and the Charles Schwab Sweep Banks at the expense of customers who were paid unreasonably low interest rates, as described above.

277.    CS&Co. also violated its duties to deal fairly and honestly with Plaintiff and the Charles Schwab Class by making material misrepresentations and omissions in the Charles Schwab Program Documents, as described above.

278.    Further, CS&Co. violated its duties to act with reasonable care to verify the truthfulness of the information set forth in the Schwab Sweep Programs, which were materially misleading and omit material facts for the reasons described above.

279.    As a direct and proximate result of CS&Co.'s breaches of fiduciary duties, Plaintiff and the Charles Schwab Class suffered damages and are entitled to recover such damages from the Schwab Defendants.

## COUNT XX

### VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940
### AGAINST ALL SCHWAB DEFENDANTS

280.    Plaintiff incorporates paragraphs 225-272 above as though fully set forth herein.

281.    During the relevant time period, CS&Co. was registered as an investment adviser under the Advisers Act.  Charles Schwab owned and controlled CS&Co.

282.    CS&Co. violated Section 206 of the Advisers Act by failing to serve the best interests of its clients, Plaintiff and the Charles Schwab Class, and by placing its own interests ahead of Plaintiff's and the Charles Schwab Class' interests in connection with the Schwab Sweep Programs, as further alleged herein.  *See* Securities and Exchange Commission Interpretation

Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 C.F.R. §276 (July 12, 2019).

283.    The Charles Schwab Program Documents should be deemed void pursuant to Section 215 of the Advisers Act, which provides that every:

> (b) . . . contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

284.    Accordingly, Plaintiff seeks rescission of the Charles Schwab Program Documents and restitution of the consideration given pursuant to their purported terms.

## COUNT XXI

## BREACH OF CONTRACT AGAINST ALL SCHWAB DEFENDANTS

285.    Plaintiff incorporates paragraphs 225-272 above as though fully set forth herein.

286.    Plaintiff and Charles Schwab Class members were parties to the Charles Schwab Program Documents with CS&Co.   The Charles Schwab Program Documents set forth the contractual terms and conditions of the Schwab Sweep Programs.   Charles Schwab owned and controlled CS&Co.

287.    Pursuant to the Charles Schwab Program Documents, CS&Co. was contractually obligated to act as an agent on behalf of Plaintiff and the Charles Schwab Class, and, thus, was contractually obligated to act in Plaintiff's and the Charles Schwab Class's best interests in seeking and negotiating reasonable sweep interest rates under the Schwab Sweep Programs.

288.    CS&Co. breached its contractual obligations by failing to provide Plaintiff and the Charles Schwab Class with reasonable interest rates on their deposits in the Schwab Sweep Programs.  Rather, the sweep interest rates provided by CS&Co. were below market and unreasonably low.  As such, CS&Co. denied Plaintiff and the Charles Schwab Class the full benefit of their bargain under the Charles Schwab Program Documents.

289.    As a direct and proximate result of CS&Co.'s breaches of contract, Plaintiff and the Charles Schwab Class sustained damages.

**COUNT XXII**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH
AND FAIR DEALING AGAINST ALL SCHWAB DEFENDANTS**

290.    Plaintiff incorporates paragraphs 225-272 above as though fully set forth herein.

291.    Plaintiff and Charles Schwab Class members were parties to the Charles Schwab Program Documents with CS&Co.  The Charles Schwab Program Documents set forth the contractual terms and conditions of the Schwab Sweep Programs.  Charles Schwab owned and controlled CS&Co.

292.    Implicit in the Charles Schwab Program Documents were duties of good faith and fair dealing.

293.    CS&Co. breached its duties of good faith and fair dealing by failing to provide Plaintiff and the Charles Schwab Class with fair and reasonable sweep interest rates on their cash sweep balances in the Schwab Sweep Programs.  Rather, the interest rates provided by CS&Co. were below market and unreasonably low.  As such, CS&Co. denied Plaintiff and the Charles Schwab Class the full benefit of their bargain under the Charles Schwab Program Documents.

294.    As a direct and proximate result of CS&Co.'s breaches of the implied covenants of good faith and fair dealing, Plaintiff and the Charles Schwab Class sustained damages.

## COUNT XXIII

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962(c)-(d), AGAINST ALL SCHWAB DEFENDANTS

295.    Plaintiff incorporates paragraphs 225-272 above as though fully set forth herein.

296.    This claim arises under 18 U.S.C. §1962(c)-(d) of the RICO Statute, which provide in relevant part:

> (c)    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

> (d)    It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

297.    At all relevant times, the Schwab Defendants were "person[s]" because they are capable of holding a legal or beneficial interest in property.

298.    During the relevant time period, CS&Co. were enterprises engaged in interstate commerce.  Through CS&Co., the Schwab Defendants knowingly and intentionally devised and operated the Schwab Sweep Programs as schemes to defraud investors.  The Schwab Defendants used their Sweep Programs to enrich themselves and the Charles Schwab Sweep Banks by paying unreasonably low interest rates to Sweep Program customers.

299.    The Schwab Defendants conducted and participated in multiple, related Racketeering Acts for the purpose of implementing the Schwab Sweep Programs.  The Racketeering Acts, which occurred, and continue to occur, regularly and continuously during the operation of the Schwab Sweep Programs over a multi-year period, constituted a "pattern of racketeering activity."  The Racketeering Acts were made possible by the regular, repeated, and continuous use of the employees, facilities, and services of CS&Co.

300.    The Schwab Defendants' Racketeering Acts included the following indictable, predicate offenses:

(a)    **Mail Fraud**: The Schwab Defendants violated 18 U.S.C. §1341 by sending and receiving materials via United States mail and commercial interstate carriers for the purpose of conducting the fraudulent Sweep Program scheme, including the Charles Schwab Program Documents.  As described above, the Charles Schwab Program Documents contained material misrepresentations and omissions knowingly and intentionally made by the Schwab Defendants for the purpose of defrauding customers.

(b)    **Wire Fraud**: The Schwab Defendants violated 18 U.S.C. §1343 by transmitting and receiving writings and sounds by means of interstate wire communication for the purpose of conducting the fraudulent Sweep Program scheme.  The writings included the Charles Schwab Program Documents, which were posted on Charles Schwab's public website.  As described above, the Charles Schwab Program Documents contained material misrepresentations and omissions knowingly and intentionally made by the Schwab Defendants for the purpose of defrauding customers.

301.    The Schwab Defendants conducted the Racketeering Acts as part of a common conspiracy to violate 18 U.S.C. §1962(c) of the RICO Statute.  The Schwab Defendants, with knowledge and intent, agreed to the overall objectives of the conspiracy and, through the Racketeering Acts, participated in a common course of conduct in furtherance of the Sweep Program scheme, including mailing and transmitting the Charles Schwab Program Documents to customers.

302.    Plaintiff and the Charles Schwab Class suffered damages by reason of the Schwab Defendants' payment of unreasonably low interest rates on their Sweep Program deposits, in violation of 18 U.S.C. §1962(c)-(d).

303.    Plaintiff's and the Charles Schwab Class's injuries were directly and proximately caused by the Schwab Defendants' racketeering activity.

## COUNT XXIV

### NEGLIGENCE AGAINST ALL SCHWAB DEFENDANTS

304.    Plaintiff incorporates paragraphs 225-272 above as though fully set forth herein.

305.    During the relevant time period, CS&Co. was the agent of, and investment advisor to, customers enrolled in the Schwab Sweep Programs, including Plaintiff and the Charles Schwab Class.  Charles Schwab owned and controlled CS&Co.

306.    The Schwab Defendants owed Plaintiff and the Charles Schwab Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Schwab Sweep Programs.

307.    The Schwab Defendants' conduct with respect to the Schwab Sweep Programs, as described above, was negligent.  By failing to provide Plaintiff and the Charles Schwab Class with fair and reasonable sweep interest rates on their cash sweep balances in the Schwab Sweep Programs, the Schwab Defendants breached their duty to act with reasonable care.

308.    The Schwab Defendants' negligence directly and proximately caused harm to Plaintiff and the Charles Schwab Class.

## COUNT XXV

### NEGLIGENT MISREPRESENTATIONS AND OMISSIONS
### AGAINST ALL SCHWAB DEFENDANTS

309.    Plaintiff incorporates paragraphs 225-272 above as though fully set forth herein.

310.     During the relevant time period, CS&Co. was the agent of, and investment advisor to, customers enrolled in the Schwab Sweep Programs, including Plaintiff and the Charles Schwab Class.  Charles Schwab owned and controlled CS&Co.

311.     The Schwab Defendants owed Plaintiff and the Charles Schwab Class a duty to act with reasonable care in connection with their cash sweep balances deposited and maintained in the Schwab Sweep Programs.

312.     The Schwab Defendants negligently made material misrepresentations and omissions in the Charles Schwab Program Documents, as described above, which were posted on Charles Schwab's public website.

313.     Plaintiff and the proposed Charles Schwab Class justifiably relied on the Charles Schwab Program Documents and accordingly deposited and maintained cash balances in the Schwab Sweep Programs to their detriment.

314.     The Schwab Defendants' material misrepresentations and omissions directly and proximately caused harm to Plaintiff and the members of the proposed Charles Schwab Class.

## COUNT XXVI

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW §349
### AGAINST ALL SCHWAB DEFENDANTS

315.     Plaintiff incorporates paragraphs 225-272 above as though fully set forth herein.

316.     The Schwab Defendants' acts and practices with respect to the Schwab Sweep Programs, as described above, constituted unlawful, unfair, misleading, and deceptive business acts and practices in violation of Section 349 of the GBL.

317.     The Schwab Defendants' misleading and deceptive business acts and practices with respect to the Schwab Sweep Programs adversely impacted Plaintiff and the Charles Schwab

Class, and, therefore, constituted consumer-oriented conduct under GBL §349, which resulted in direct harm to Plaintiff and the Charles Schwab Class.

318.    Accordingly, Plaintiff and the Charles Schwab Class seek appropriate relief under GBL §349, including injunctive relief and damages.

## COUNT XXVII

### UNJUST ENRICHMENT AGAINST ALL SCHWAB DEFENDANTS

319.    Plaintiff incorporates paragraphs 225-272 above as though fully set forth herein.

320.    The Schwab Defendants financially benefitted from the unlawful acts alleged herein by paying Plaintiff and the Charles Schwab Class unreasonably low and below market interest payments on their Sweep Program balances.  These unlawful acts caused Plaintiff and the Charles Schwab Class to suffer injury and monetary loss.

321.    As a result of the unlawful acts alleged herein, the Schwab Defendants were unjustly enriched at the expense of Plaintiff and the Charles Schwab Class.

322.    The Schwab Defendants have received, and are holding, funds belonging to Plaintiff and the Charles Schwab Class, which in equity the Schwab Defendants should not be permitted to keep but should be required to refund to Plaintiff and the Charles Schwab Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the E*TRADE Class, Merrill Lynch Class, and Charles Schwab Class (collectively, "Sweep Program Classes"), prays for relief and judgment, as follows:

A.      Declaring that this action is a proper class action, certifying the Sweep Program Classes, appointing Plaintiff as representative of the Sweep Program Classes, and appointing Plaintiff's counsel as Class Counsel for the Sweep Program Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the Sweep Program Classes for all damages sustained as a result of Defendants' wrongdoing, in amounts to be proven at trial, including interest thereon;

C.      Awarding treble damages in favor of Plaintiff and the Sweep Program Classes;

D.      Awarding Plaintiff and the Sweep Program Classes their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

E.      Ordering rescission of the Morgan Stanley Program Documents, Merrill Lynch Program Documents, and Charles Schwab Program Documents, and restitution of all fees and other benefits received by Defendants thereunder; and

F.      Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  January 6, 2025

**JOHNSON FISTEL, LLP**

*/s/ Ralph M. Stone*
RALPH M. STONE (State Bar No. 2428860,
SDNY Bar No. RS-4488)
620 Fifth Avenue, 2nd Floor
New York, NY 10020
Tel.: (212) 292-5690
Fax: (212) 292-5680
ralphs@johnsonfistel.com

MICHAEL I. FISTEL, JR.
MARY ELLEN CONNER
WILLIAM W. STONE
Murray House
40 Power Springs Street
Marietta, GA 30064
Tel: (470) 632-6000
Fax: (770) 200-3101
michaelf@johnsonfistel.com
maryellenc@johnsonfistel.com
williams@johnsonfistel.com

*Attorneys for Plaintiff James Bertonis*